THE STATE OF OHIO *v.* CONSOLIDATION COAL CO.,
CENTRAL DIVISION.*

(No. 16558—Decided December 10, 1974.)

*Appeal dismissed April 16, 1975.

County Court of Harrison County.

*Mr. William J. Brown*, attorney general, and *Mr. Jay McKirahan*, for plaintiff.

*Messrs. Schmidt & Ingram* and *Mr. William J. Downer*, for defendant.

WORLEY, J.** This matter was heard upon a motion by the defendant to dismiss the complaint, a criminal charge, for the reason that it is vague and imprecise, fails to state ascertainable standards of guilt, and is so indefinite that men of common intelligence must guess at its meaning, and be uncertain as to its application.

The question here to be determined is whether a certain mandatory prohibition of recently enacted legislation by the Ohio General Assembly is constitutional. The provision objected to is found in R. C. 1513.16(B)(5), one of a lengthy set of rules and stipulations intended for and obviously applying to the mining of coal by the stripping process. R. C. 1513.16 is entitled "Reclamation by operator" and paragraph (B) thereof has five sub-paragraphs, each stating steps the operator shall take for and during mining and reclaiming. Paragraph (B) prescribes, "while mining and reclaiming, an operator shall" do, and also prevent, the occurrence of a number of situations or circumstances, both natural and contrived, stated as follows:

"(5) Prevent pollution of waters of the state, substantial erosion, substantial deposition of sediment, landslides, accumulation or discharge of acid water, and flooding, and shall maintain ditches, dikes, pumps, and other drainage facilities necessary to prevent acid water from draining into or accumulating in the pit."

Sub-paragraph (C) and (D) each have numerous mandatory requirements, including one that requires the operator not only to plant but to grow vegetation. As an aside remark it may be observed that this is an effort which farmers, gardeners, and lawn keepers have made for many generations of mankind, not always with entire success.

---

**Judge John G. Worley, retired, sitting by assignment,

However, it is necessary to direct attention to the formal statement of the charge made against the defendant in this case which is as follows:

"That Consolidation Coal Company, Central Division at Athens Township, Harrison County, Ohio, on or about June 11, 1974, did fail to prevent substantial deposition of sediment in waters of Boggs Fork in violation of Sec. 1513.16 (B) (5) and 1513.17 (D), Ohio Revised Code."

R. C. 1513.17 (D) seems to have been merely an emphasis on preceding mandatory rules by saying that any violation of any other provision of R. C. Chapter 1513, a rule *adopted thereunder*, or an *order of the chief*, is prohibited. However, it appears that the 1973 supplement shows that paragraph (D) may have been deleted as of 1974. The purpose of its inclusion in this criminal charge is not explained.

With regard to this formal criminal charge it is noted that although the state, a county and township are named as a site of the crime, it is not actually stated what Boggs Fork is, or that it is in the governmental units mentioned or that it is the specific site of the offense. There appears in R. C. 1513.01(K) a description of "deposition of sediment," and R. C. 1513.01 (L) defines "waters of the state," as follows:

"Waters of the state means all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and all other bodies or accumulations of water, surface or underground, natural or artificial, which are situated wholly or partly within, or border upon, this state, or are within its jurisdiction, except those private waters which do not combine or effect a junction with natural surface or underground waters."

This quotation is here included to indicate the extreme effort made to include in the prohibition against sedimentation in any water, of any kind, either inside or outside the state, above ground or below. Although it is not considered essential to dwell upon this portion of the reclamation code at this time, the very extensive enumeration of the classes of waters in which sedimentation must be prevented, affords some illumination into the kind of restric-

tions which have been imposed upon a legitimate business, which is otherwise recognized to be a supplier of energy producing materials, widely thought to be at this time in very short supply.

With some hesitation the court at this point will include, as possibly helpful in the over-all view of the serious problem here appearing an historical resume. Much is being said about an "energy crises," which will affect people and governments for years to come. In this uncertainty regarding the possibilities of future maintenance of the forms and practices of mankind, it may be justifiable to present a view point, arising out of a man-made set of rules. A court, in construing the meaning and application of legislative enactments is not in a position to determine their constitutionality on the basis of whether they are practical, workable, desirable or undesirable, or ultimately beneficial or disastrous. The function and the duty of the court is to determine whether a legislative act conforms with, and lies within the boundaries established by the fundamental provisions of the organic law, the fundamental basis within which government of peoples must exist.

In a brief resume to be here made of the attitudes and activities of a group of those in the body politic, from which such legislation as the one in question apparently arose, the court is not assuming to disparage the sincerity and good intentions of a group which has come to be known as environmentalists. But it is not believed that any groups, programs or practices arise without some background. Man does not exist in a vacuum, nor do legislatures conceive of legislation without motivation. It is likely that sponsorship of legislation often arises from the outside rather than from within the membership of the legislative body. This fact and what will be discussed as a background for the particular enactment under consideration is not intended to be a criticism or disparagement of the integrity of either sponsors or those who have approved some legislative act about which there had been much previous question on the matter of its advisability, although the wisdom and ultimate effect of legislation would always be open to questioning on the matter of its desirability and effect. On

this point, the conclusion is made in a discussion found in 10 Ohio Jurisprudence 2d 232, Section 154, where it is stated that, constitutional or not so may depend on the operation and effect, not on the form only, that the act may assume. The substance of an act, rather than its form, may be of significance.

A further discussion related to the passage mentioned above is found on page 205, Section 126, where it is said that, without regard to the personal opinion of the Judge, as to purpose and effect, does an enactment transcend the limits of legislative power?

With this introduction, it will be deemed helpful in the examination of the status of the present strip mining laws to review briefly the history of this mining method itself, as it arose in Ohio.

Some 70 years ago it was observed that the use of large power shovels could more efficiently carry on many operations, and lighten the labor of men and that of beasts of burden in excavations and in construction projects. The success of such large machinery in constructing the Panama Canal allowed men to conclude that the future progress of the nation could be enhanced by the introduction of the use of large equipment more widely.

About 60 years ago the first, and relatively crude, shovel of the kind mentioned was put in operation in Jefferson County in Eastern Ohio. The use of power shovels, originally using steam boilers, now electrically powered and controlled, expanded in the hilly areas of Eastern Ohio. Their use in the production of bituminous coal was and is feasible in a relatively limited area of the state of Ohio by reason of several natural factors. These were, that the carboniferous deposits (coal) lay near the surface of the ground in this area, where they could be reached and also that the surface displacement resulting from mining was not felt to be a serious detriment, because over the course of centuries much of the top soil had washed from the hills, the fertility was gone, and most agricultural pursuits were difficult and unprofitable. Removal of the mineral wealth was accepted by the land owner through reasons of economic urgency and for a further reason that urban industry

offered more profitable return than long hours of labor on the farm to eke out a meager living.

The consequent disturbance to the surface of a few small counties in the hill country was not seen as a serious deprivation to production on the lands of the state, which in its northern and western areas had immense stretches of level land, of great fertility, which were easily worked.

The mining by stripping greatly expanded in the years following its beginning and was viewed as furnishing an opportunity for income and financial returns much greater than in a life time effort to extract a living from worn out surface soil. A further benefit was felt in that profitable employment was made available near their home to large numbers of young men, who had for years been drawn away to the city by the attraction of high wages and an easier life. It was true that older farm families, with traditions based upon the soil had some reluctance to sell or lease their homesteads for mining purposes, but realized that the least usable part of farms were largely the ones affected, and the valleys and lower slopes remained for their use. But in any case, these hill-country citizens were strongly imbued with the theory which they had always considered an essential right protected by law, that their property was their own, subject to such disposition as they wished, unless taken and paid for by the state for public purposes.

But it occurred that in later years residents from the industrial centers of the north and from the plains of the central and western areas of the state in traversing the hill counties of the east, noticed that the earlier face of what is now designated as the outskirts of Appalachia had been changed, the circumstance of which they appeared to dislike, although without any stake of their own in the matter, except that their aesthetic sensibilities may have been distressed. In time, but more particularly within recent years, the hue and cry against this type of mining reached the ears of legislatures, and great agitation arose to restrict or eliminate strip mining.

Another and apparently a larger factor in the wave

of criticism of, and objection to, strip mining was the emergence of a cult designated as environmentalists, who deprecated the growth of air and water pollution, which had arisen in some industrial localities through manufacturing enterprises whose factories emitted large amounts of smoke and gases. This group had originally formed through a common objection to the over-running of lands by massive projects, such as airports, four-lane highways from city to city, and over all the constant incursion of an ever expanding population on a rustic countryside. The loss of large tracts of open country very likely may have undesirable results, but is recognized as an inevitable result of urbanization and a greater dependence by mankind on machines particularly for locomotion. The efforts at reduction of air pollution in some centers obtained large support, which was well justified. The mining and removal of coal from the hills had no deleterious effects upon the populations, except that temporarily at least the landscape did not look as inviting. Breathing was not affected, and over the years, even without reclamation the scars of the earlier operations were largely effaced. Nature has a way of taking care of its own. Indeed those who are naturalists, or ecologists, as distinguished from environmentalists, may likely have few qualms about the temporary scarring of the landscape. The wildlife, the bird and animal life can return to their original habitat. It may be seen as unlikely that organizations of admirers of the outdoors and of the life forms of field and wood, such as the Sierra Club, the Audubon Society, the National Wildlife Federation or Nature Conservancy would be seriously disturbed by the temporary displacement of soil, done for the economic benefit of mankind. Those who are occupants of the city have mostly little knowledge of the restorative powers of nature, the working of ecology, and of the principle of the balance of nature. The positions taken by the more ardent environmentalists, and loudly asserted, show a similarity to the nature of other popular movements which spring up, but often rapidly pass, whose aims seem desirable, but are discounted by the failure of those supporting

them to recognize the probable results of their agitations in seeking radical remedies to cure a relatively slight degree of ill. The environment is probably only different from that of simpler times, long past, in that there are more people using too many automobiles, and demanding the commodities which smoking factories supply.

The real naturalist with a long held feeling for the outdoors can see that nature tends to alleviate the harshness with which man has dealt with the earth, and will wish to avoid restrictive legislation harmful to those who own lands of which the naturalist is an observer. What they do desire to avoid are such projects as the draining of the Everglades for airports or cattle ranches, or the constant proliferation of roads and highways requiring thousands of acres, the purpose of which is to afford always increased acceleration of already speedy travel from city to city, but leaving bare highwalls and borrow pits. The real naturalist has observed that even if for a time there is some aesthetic loss occasionad by supplying needs of the people, he has seen that wildlife, the deer, the beaver and the fox, and wild ducks and geese, can and will reinstate themselves where they had for generations disappeared. The water fowl will make use of newly formed waters, and grouse and quail will resume the habitat from which they have long been displaced. These restorations have already occurred widely in strip mined areas of Eastern Ohio.

A group however well meaning its tenets, which seek to prevent owners of property from the use of their private lands for the benefit of the public in general by coal production and who, presumably for aesthetic reasons alone wish to see retained a rustic aspect for their benefit, are considered by informed persons as bemused by the vision of a return to the supposed bucolic bliss of an earlier age, inherent before the era of crowded industrial cities and ever expanding population pressures.

With this rather extensive survey of, and comment on, the background circumstances appearing to have influenced the enactment of the legislation, complained of as uncon-

stitutional, the court will proceed to examine the text of the criminal charge itself, its wording, and its compliance, or failure to comply with constitutional requirements.

The charge is that the defendant while mining or reclaiming failed to prevent substantial deposition of sediment. A cursory reading of this charge evokes the immediate question as to what is "substantial." In R. C. 1513.-01, a number of terms used in R. C. Chapter 1513 are defined, such as "reclamation," "degrees" [of inclination], "pollution," "deposition of sediment," "waters of the state," and others, but *"substantial"* is not.

"Deposition of sediment," as proscribed in the law, means "placing or causing to be placed in any waters of the state, in stream beds or on or off the land described in an application for a strip mining license, or upon other lands, any organic or inorganic matter which settles, or is capable of settling, to the bottom of such water and onto such beds or lands." As organic or inorganic matter covers all substances on the earth it must be concluded that nothing is excluded from the prohibition against settling. Probably nothing whatever is incapable of settling under possible circumstances. A floating buoy can settle, as do ships which normally are expected to remain near the top of water. Considering the effect of the law of gravity, it can not be believed that there is any object, of any kind, anywhere, which would not be a possible subject for a criminal charge under the prohibition here stated. Nor would any small lot owner, or larger land holder be exempt from the charge of criminal sedimentation following downpours occurring under present meterological conditions.

In this all inclusive catalog there is no definition of "substantial." However, Websters Third New International Dictionary contains nine meanings for the word. Of those given there, that might be applicable, are "material," "considerable in amount," "large." But who distinguishes these? The measure of each of these could vary greatly under different sets of circumstances. The plaintiff sets forth that "absolute precision or certainty is

not required in passing a statute, and it is not necessarily void because susceptible of different interpretations, or has a meaning difficult to ascertain." But this a criminal charge!

The defendant on its part has based the claim of violation of the constitution by the section in question, on the vagueness and uncertainty of its meaning, and the difficulty in applying it. Among cases cited are *Chicone* v. *Liquor Control Comm.* (1969), 20 Ohio App. 2d 43, 251 N. E. 2d 864; *Patten* v. *Aluminum Castings Co.* (1921), 105 Ohio St. 1, 136 N. E. 426. The defendant calls attention to Judge Herbert's concurring opinion in *State, ex rel. Miller,* v. *Brown* (1958), 167 Ohio St. 452, 150 N. E. 2d 46, where there is quoted a part of the syllabus in a Wyoming Supreme Court case, as follows:

" 'When statute has been left by law making power in incomplete form, and is so indefinite and uncertain as to be incapable of enforcement, courts are obliged to declare it void, and may not add to it by judicial legislation.' "

In considering the requirements resting upon the plaintiff in the instant case, it is to be kept in mind that it charges a criminal offense, under which circumstance the defendant is entitled to know precisely the meaning and application of a charge against it, and the defendant and the court must know what defendant's rights are so that the penalty of the statute can be applied and enforced.

The court, in viewing the elements of this case, well realizes that the enactments of the Legislature are afforded the presumption of constitutionality, and that very definite defects in form of statement, or in the possibility of application must exist before a failure of constitutionality can be determined to exist.

In an attack on the constitutionality of a legislative enactment the plaintiff defending against the claim of the defendant that the criminal charge brought against it is unconstitutional has cited cases which point out the presumption that a legislative enactment is constitutional, and one case, *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, is used to support the proposition that in order

to find the statute unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible. *Defenbacher*, held that the General Assembly had the right to appropriate funds for the use of veterans' organizations. The legislation in this case was clear and uncomplicated, and in no sense uncertain in its meaning. Likewise, the case of *State, ex rel. Jackman*, v. *Court of Common Pleas* (1967), 9 Ohio St. 2d 159, legislation allowing discovery depositions in criminal cases was not contrary to the Constitution of the state of Ohio. In that case, attention was called to the distinction between the federal constitution as being a grant of power, whereas the state General Assembly is only inhibited by the specific limitation of the Constitution; that is, unless the legislative discretion had been restricted by the Constitution in connection with the subject matter of the legislation.

The plaintiff further contends that the law supported complaint in question does not constitute "a gross abuse" of legislative authority. Upon this point, the defendant recognizing that "deposition of sediment" is a natural, and inherently an uncontrollable force among the laws of nature, produced by the action of the rains and the wind in accordance with the operation of the law of gravity, contends that predicating a crime upon such circumstances must be considered as an extreme extension of the control of the state upon the lives and the activities of its citizens. It needs only to be recalled that without the action of natural laws producing erosion and sedimentation there would be no soil upon the earth, and therefore no race of men as is known today. The elements of "erosion," "sedimentation," and indeed "landslides," which are also prohibited by this section of the statute, have been essential in producing a habitable planet. However far the authority of legislation may be permitted to go, it is not anticipated that it can exercise control over the waters and the wind. It was, in fact, the position taken by the defendant in oral argument on this motion that an inevitable result of the restrictions of this chapter would be to destroy the

defendant's ability to carry on its production. The restrictive and comprehensive requirements of the law would seem to support such contention, and if this occurred, would in itself constitute the taking of private property without compensation, and be a violation of "due process," as protected in the Fourteenth Amendment to the United States Constitution.

The brief of the plaintiff takes the position that the defendant in this case because of its experience and role among strip-mining companies should be expected to know and understand the meaning of the charge made against it, however imprecise and inadequate. The inference would appear therefore that it, as a citizen of the state, is not as much entitled to the equal protection of the law as is another citizen. But, a cardinal precept of law is that all, regardless of distinctions, stand equal before the law. The court sees it as a dangerous departure from this rule to insist that a particular defendant is less entitled to have its alleged offenses specifically set forth and to the right to hold and use property, and to the right to "due process" in general.

The plaintiff says that one of ordinary comprehension should be able to understand a criminal charge and that the defendant in this case is not entitled to be more specifically informed in the charge as to what omissions it was guilty of and what preventive steps it had failed to take, and further maintains that words are sometimes too inadequate, or ineffective to permit that to be achieved. An answer to that explanation would be that a criminal complaint too uncertain to describe might better be omitted altogether. A support for defendant's position is claimed in citing the case of *Boyce Motor Lines* v. *United States* (1952), 342 U. S. 337, 340, for the Supreme Court of the United States said there:

"A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and an attorney in defending one charged with violation. * * *"

The opinion does proceed to say that few words possess

the precision of mathematical symbols, and that no more than a reasonable degree of certainty can be demanded. The defendant desires to know what deposit of sediment will be held to be "substantial."

Obviously the parties here differ as to what is "a reasonable degree of certainty" but the defendant wants to be informed, when threatened with serious penalties, what it can, and can not do. It is not the duty of the court nor of the defendant, to suggest a wording by which the uncertainties of the complaint can be lessened. A helpful suggestion can be made, however, that in its zeal to limit or eliminate the strip mining of coal, it not be attempted to require that the insurmountable forces and elements of nature themselves be conquered. The winds and the floods are not to be subjugated by the puny might of man. In the County of Harrison, in the months from March to November, 1974 inclusive, unprecedented quantities of rain fell, during numerous persistent rainy periods, no doubt resulting in great deposition of sediment in some locations.

The enactment of portions of R. C. Chapter 1513 has the effect of attempting to make malum per se (inherently wrong, or vicious) that which might be by some means alleviated or may be inherently uncontrollable, but is normally neither criminal or essentially harmful.

The authority of the Legislature to regulate the lives and affairs of men is not unlimited, whether its enactments arise after well considered studies of a problem, or appear to be a result of the insistence of pressure groups.

"Courts may declare legislation void not only because the legislative body has exceeded its power, but also because the legislative intent is not expressed with sufficient definiteness and certainty * * *." 10 Ohio Jurisprudence 2d 189, Section 107.

"Since the court has the right it consequently has the duty to determine whether a legislative act, drawn in question in a suit pending before it, is opposed to the Constitution of the United States, or of Ohio and to strike down any act which clearly conflicts * * * regardless of the desirability of such legislation. * * *" 10 Ohio Jurisprud-

ence 2d, *supra*, at Section 108. See, also, *State, ex rel. Bowman*, v. *Bd. of Commrs. of Allen County* (1931), 124 Ohio St. 174; *C. W. & Z. Rd. Co.* v. *Commrs. of Clinton County* (1852), 1 Ohio St. 77; *Hixon* v. *Burson* (1896), 54 Ohio St. 470.

"* * * This principle is not in disparagement of the legislative department of government. It does not confer upon the judiciary power superior in its nature to that of the Legislature, but it confers upon it, in particular instances, and for particular purposes, the power of declaring and enforcing the superior powers of the organic law." 10 Ohio Jurisprudence 2d, *supra*, at Section 107. See, also, *Rutherford* v. *M'Faddon* (1807), Pollack, Ohio Unreported Judicial Decisions, 71; *Miller* v. *State* (1854), 3 Ohio St. 475.

In stating that the defendant ought to know what its limits are, and assuming that the environmentalists must be right, there is the inference that being a corporation of some size and financial capacity, it does not need the protection of the state. But the rule of the Constitution is that all citizens are equal before the law, and entitled to the equal protection of the law. The supposedly better favored have the right also, as well as the humbler citizens of the state. Recently, the Supreme Court of the United States declared capital punishment unconstitutional for the reason that it was said to be imposed unequally by courts over the nation, longstanding as the punishment was, and thought to be useful, and by most citizens necessary, in cases of infamous homicide. It is difficult to conceive that this sedimentation rule could be enforced with an equal consistency over the whole country. The interpretation of the Constitution should hew to the line, for the law is a hard taskmaster and assumes that the laws of the state shall avoid political extremes, contrary to the constitutional mandate that all must stand equal in the eyes of the law.

It was early decided by the courts, in these words:

"An act of the legislature that divests vested rights, that violates contracts, or that assumes to control or to

exercise judicial powers, is unconstitutional and void."
*Chestnut* v. *Shane's Leesee* (1847), 16 Ohio 599.

In its attention to matters believed by some to be important, but that appear to be difficult to regulate, an inclination may arise to exceed the boundaries of legislative authority.

"The power of the General Assembly to pass laws can not be delegated by them to any other body * * *." It "exercises only delegated authority; and any act passed by it not falling fairly within the scope of 'legislative authority,' is as clearly void as though expressly prohibited." *C. W. & Z. Rd. Co.* v. *Commrs. of Clinton County, supra.* See, also, *Miller* v. *State, supra.*

It is a matter of some surprise that in all the legislation concerning strip mining the stipulation of Section 19 of Article I (Bill of Rights) of the Ohio Constitution has been little considered.

"Private property shall ever be held inviolate but subservient to the public welfare."

While it may be true that some uncertainty as to the scope of this article may have arisen, with regard to what are known as "police powers," it could hardly be maintained that "police powers" can comprehend a matter of sedimentation. What public welfare would it maintain in a remote rural area?

In all particulars the courts must carefully construe statutes that come before them, especially criminal charges, including R. C. Chapter 1513 with all constitutional limitations in mind. The chapter in which this legislative Act occurs appears as a typical example of the theory that the powers of the state have been justifiably expanded, and that it is necessary to guide, limit and control more and more the activities and aspects of the life of its citizens. However benevolent the purposes of such expansion, there is a code by which the validity of this spreading control, and encroachment into numerous fields, can be tested. This is the constitution of the state and of the federal union.

In R. C. Chapter 1513, the Legislature has granted to an administrative officer, the chief of the Division of

Reclamation, plenary powers to direct and control strip mining in Ohio, with a minimum of guidelines, so that unlimited authority is bestowed, which is claimed by the defendant to constitute a death sentence for the industry. This does not appear to be an exaggeration considering that a failure to prevent sedimentation can be penalized, and ultimately the mining license which must be issued by the state before mining can begin, could be rescinded for many years. This has the effect of destroying the property rights of the defendant. With one hand the state confers a license to mine, with the other withdraws it by making performance impossible. Comprehensive powers granted to the chief of the Division of Reclamation in R. C. 1513.02 include the following:

"(1) Adopt, amend and rescind rules:

"(a) To administer and enforce Chapter 1513 of the Revised Code;

"(b) To implement the requirements of Chapter 1513 of the Revised Code for the reclamation of land affected by strip mining, including such rules governing mining practices and procedures, segregation and placement of soil and topsoil, backfilling, grading, terracing, resoiling, soil conditioning and reconditioning, planting, establishment of drainage patterns, construction of impoundments, and the construction, maintenance, and disposition of haul roads, ditches and dikes, as may be necessary or desirable, under varying conditions of slope, drainage, physical and chemical characteristics of soil and overburden, erodability of materials, season, growth characteristics of plants, and other factors affecting strip mining and reclamation, to facilitate the return of the land to a condition required by such Chapter * * *."

Although not all of the items delegated to the chief of reclamation, the above seems an overwhelmingly large order for the chief to carry out en masse under delegation by the Legislature. It would appear to require a superhuman wisdom and capacity.

Coming now toward a conclusion of this opinion, the court will make use of the case of *State* v. *Wallace* (1974), 40 Ohio Misc. 29. That decision found the provision of R.

C. 1509.12 unconstitutional, as being an illegal delegation of legislative authority to the chief of the Division of Oil and Gas. In this section it was provided that any well which is or becomes incapable of producing oil or gas in commercial quantities shall be plugged. The objection was made that there is no criterion stated for the determination by this chief regarding when a well is incapable of producing oil or gas in commercial quantities. In this opinion and decision, at page 34, there is a quotation from Mr. Justice Holmes of the United States Supreme Court that:

"* * * The law embodies the story of a nation's development through many centuries * * *. In order to know what it is, we must know what it has been, and what it tends to become. We must alternately consult history and existing theories of legislation. * * *"

The court's opinion in *Wallace* also contains reference to a doubt that exists as to the province of courts of original jurisdiction to declare state laws unconstitutional. Whether believed to be within such province or not, this matter was submitted to this court on the question of constitutionality, and in complying with the commission the court only performs what it believes to be a duty.

A supplemental brief filed with the court proposes that a different standard must apply on the question of vagueness, when the challenged statute is in the nature of economic or business regulation. But, in fact this regulation is an attempt to require the control of laws of nature, rather than those in the economic or business field.

It is further maintained in the latest brief of the plaintiff that the new Ohio Criminal Code would show that "substantial" is a sufficiently definite standard, since it is frequently used in definitions of criminal conduct. Have these provisions been approved by the criminal courts? And do they relate to situations which are self explanatory, such as "deadly force" and "serious physical harm to persons," which are represented as being in the same category as "substantial deposition of sediment"?

In the case under consideration, the word "substan-

tial'' appears to be subject to so many variables of weather, waters, and variations in opinions, and viewpoints of enforcers of the rule, that it can not and does not furnish an applicable and meaningful standard of action. From the foregoing discussion, the court is compelled therefore to hold this part of R. C. 1513.16(B)(5) as being so vague and indefinite that it fails to satisfy recognizable standards of action, is unconstitutional and void, and the court does so find. For the reason that other portions of the subparagraph and chapter were not drawn in question, the court can not pass upon their validity. This portion is found to fail to comply with requirements of ''due process'' under the Fifth and Fourteenth Amendments to the Constitution of the United States and the ultimate result will be the taking of private property without compensation. The court is also unable to reconcile the statute with Section 19 of Article I of the Ohio Constitution.

*Complaint dismissed.*