THE STATE OF OHIO, APPELLANT, *v.* WALLACE, APPELLEE.

(No. 12-75-10—Decided August 11, 1976.)

*Mr. William J. Brown,* attorney general, and *Mr. Alexander G. Thomas,* for appellant.

*Mr. M. Neil Wallace,* for himself.

GUERNSEY, J. On December 11, 1973, a complaint was filed in the County Court of Putnam County charging the defendant in three counts with on or about December 5, 1973, failing to plug three "wells" "as required by the Division of Oil and Gas Chief Order No. 178, attached

hereto as exhibit A, contrary to Section 1509.12, Ohio Revised Code." Adjudication Order No. 178, attached to the complaint, purports to be an order of the Chief of the Division of Oil and Gas, Department of Natural Resources "effective without prior hearing under Section 119.06 of the Revised Code," directed to M. Neil Wallace and ordering him to cause the oil and/or gas wells identified in the order to be properly plugged and abandoned no later than 30 days after the receipt of the order. The order recites that the action is based on records showing Wallace to be the operator-owner of the wells, that investigation by representatives of the division "revealed that there has been no effort made to produce these wells in a diligent and workmanlike manner in the past two years," and that R. C. 1509.12 requires plugging of wells incapable of producing oil or gas in commercial quantities unless written permission is granted by the chief. On January 8, 1974, defendant entered his plea of not guilty.

Nothing of further consequence transpired until August 7, 1975, when another complaint was filed which in essence charged in the first count, as one offense, the failure to plug on or about December 5, 1973, the same three wells referred to in the three counts of the original complaint. As counts "2 through 596" it charged the failure to plug the same three wells "[o]n or about December 6, 1973 and each day thereafter through July 24, 1975." This was not labeled as an amended complaint. However, as there appears no action of the trial court in the record with further specific reference to the original complaint, we will consider the original complaint merged in the one filed August 7, 1975.

The defendant filed his motion to dismiss the complaint on the grounds that (1) R. C. 1509.01(D) and 1509.12 are "ambiguous, vague, and uncertain and are, therefore, unconstitutional," and (2) R. C. 1509.12 "as it relates to this defendant contains an illegal delegation of legislative powers by the General Assembly to the director of an administrative agency and is, therefore, unconstitutional."

On December 15, 1975, the trial court, without opin-

ion, entered its judgment sustaining the motion to dismiss the complaint and discharging the defendant, citing *State* v. *Wallace* (1974), 40 Ohio Misc. 29, and *State* v. *Consolidation Coal Co.* (1974), 43 Ohio Misc. 77. It is from this judgment that the state of Ohio sought and was granted leave to appeal. The appellant assigns as error that the judgment is contrary to law in that the trial court erred in its determination that R. C. 1509.12 "constitutes an unlawful delegation of authority by the legislature." The appellee neither filed a brief nor orally argued the merits of the appeal.

Although the trial court did not specifically hold that R. C. 1509.12 was unconstitutional as an unlawful delegation of legislative authority, reference to the cited cases, the former being a decision of the Findlay Municipal Court relating to this statute and the latter being a decision of the County Court of Harrison County relating to a strip mining statute, indicates that such is the basis of his decision. Thus, the initial issue before this court is whether the provisions of R. C. 1509.12, attempted to be invoked here, constitute an unconstitutional delegation of legislative authority, by reason of ambiguity, vagueness and uncertainty constituting a lack of adequate standards.

We derive no help from the case of *State* v. *Consolidation Coal Co., supra,* cited by the trial court, because, though in a lengthy opinion many faces of the issue of constitutionality were discussed, the actual decision of the county court therein involved was that the complaint should be dismissed because the word "substantial," used in defining the duties of an operator in R. C. 1513.16(B)(5) with reference to preventing deposition of sediment, is "so vague and indefinite that it fails to satisfy recognizable standards of action, [and] is unconstitutional and void." It does not appear in that decision that any exercise of a delegated legislative power was actually involved in the charge against the operator.

The case of *State* v. *Wallace, supra,* is factually much the same as the instant case, involving the same defendant and the same adjudication order by the Chief of the Oil

and Gas Division. The Findlay Municipal Court held, with emphasis on the words "commercial quantities," that the delegation to the Chief of the Oil and Gas Division of the power to order any oil or gas well plugged "which is or becomes incapable of producing oil and gas in commercial quantities," constitutes an "illegal delegation of legislative authority * * * in that he is vested with unlimited authority at his discretion without the requisite guidelines, yardstick or other measuring device."

Do these cases involve, however, a delegation of legislative authority at all?

R. C. 1509.12, among other things, prescribes:

"Unless written permission is granted by the chief, any well which is or becomes incapable of producing oil or gas in commercial quantities shall be plugged, but no well shall be required to be plugged under this section which is being used to produce oil or gas for domestic purposes, or which is being lawfully used for a purpose other than the production of oil or gas. When the chief finds that a well should be plugged, he shall notify the owner to that effect by order in writing and shall specify in such order a reasonable time within which to comply. No owner shall fail or refuse to plug a well within the time specified in the order. Each day on which such a well remains unplugged thereafter constitutes a separate offense."

R. C. 1509.99 provides:

"Whoever violates sections 1509.01 to 1509.31, inclusive, of the Revised Code, or any rules, regulations, or orders issued pursuant to these sections, shall be fined not less than one hundred nor more than five hundred dollars for a first offense; for each subsequent offense such person shall be fined not less than two hundred nor more than one thousand dollars."

Our attention has not been invited to and we are not aware of any rule or regulation adopted by the Chief of the Division of Oil and Gas pursuant to R. C. 1509.03 to administer, implement, and enforce R. C. Chapter 1509 dealing with which wells should be ordered plugged because

incapable of producing oil or gas in commercial quantities.

R. C. 1509.12 does not purport to grant to the Chief of the Division of Oil and Gas any discretion in ordering a well plugged. It would seem that he does have an uncertain or unclear discretion in determining whether written permission should be granted *not* to plug a well "which is or becomes incapable of producing oil or gas in commercial quantities." However, when such permission has not been granted and the chief finds that the well is not being used to produce oil or gas for domestic purposes, and is not being unlawfully used for a purpose other than the production of oil or gas, and that it is or has become incapable of producing oil or gas in commercial quantities, he has no alternative under the statute but to find that the well should be plugged and to notify the owner to that effect by order in writing.

It thus appears that the authority exercised by the Chief was solely that prescribed by the statute in enforcing it against an individual and not the formation or adoption of a rule or regulation made applicable to the public in general or any segment thereof pursuant to delegated legislative authority. The order was issued in the exercise of the adjudicating power and protective appeals were provided to, but not used by, the well owner, from the action of the Chief in making such order. 1 Ohio Jurisprudence 2d 445, Administrative Law and Procedure, Section 36.

The issue presented by the facts is not, therefore, one of an unconstitutional delegation of legislative power but merely whether the statute in form is unconstitutional by reason of an alleged ambiguous, vague or uncertain standard adopted by the legislature, *i. e.*, whether the capability of a well of producing oil or gas in commercial quantities is a term lacking sufficient meaning to be enforcible.

In *Eastman* v. *State* (1936), 131 Ohio St. 1, the Supreme Court held, in its syllabus:

"4. A statute cannot be held invalid for uncertainty if any reasonable and practical construction can be given to its language; mere difficulty in ascertaining its meaning, or the single fact that it is susceptible of different

interpretations will not necessarily render it nugatory; it is the duty of courts to endeavor by every rule of construction to ascertain the meaning of and give full force and effect to, every enactment of the General Assembly not obnoxious to constitutional prohibition.

"5. Words in common use will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them."

See, also, *State, ex rel. Forchheimer,* v. *LeBlond* (1923), 108 Ohio St. 41.

The phrase "which is * * * incapable" as contrasted to the phrase "which * * * becomes incapable" obviously has reference to the distinction between a well which never had that capability, *e. g.*, a dry hole, and a well which was once a producer. Prudent operation has nothing to do with the statutory condition of incapability justifying plugging. That condition may have been achieved by imprudent operation but it might also exist in the face of prudent operation. Once the condition exists plugging is required whether the operation has been prudent or imprudent unless, of course, the owner brings his well within the statutory exceptions.

Nor is the phrase "commercial quantities" equivalent to the phrase "paying quantities" often found in oil and gas leases, and in the statutes and regulations pertaining to oil and gas wells. "Paying quantities" connotes a profit; "commercial quantities" does not. "Quantities," in the sense used here, is defined in Webster's Third New International Dictionary (1971) as "great amounts or numbers." "Commercial" is defined by the same authority as "of, in, or relating to commerce," and "commerce" is defined in this context as "the exchange or buying and selling of commodities esp. on a large scale and involving transportation from place to place." Thus, "commercial quantities" can fairly be defined as "of sufficiently large amount to be sold by the owner to a buyer for transport elsewhere." Necessarily implied by such definition is the existence of a market, *i. e.* (likewise as defined by Webster), "a sphere within which price-making forces oper-

ate and in which exchanges in title tend to be followed by actual movement of goods." Accordingly, bearing on the question of fact whether the oil or gas well is incapable of production in commercial quantities is the subordinate question of whether the oil or gas produced can be marketed, which also involves other subordinate factors of whether the quantity is sufficient and the sales price low enough to interest a buyer in view of transport facilities available and the costs thereof.

We have thus demonstrated that the phrase "which is or becomes incapable of producing oil or gas in commercial quantities" in its application to the issue here consists of words in common use which may be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them. Accordingly, we find that the phrase does not constitute legislation objectionable under the constitution or otherwise for ambiguity, vagueness or uncertainty.

We conclude that the trial court committed error prejudicial to the appellant in dismissing the complaint and that its judgment in doing so should be reversed.

*Judgment reversed.*

COLE, P. J., and MILLER, J., concur.