[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 399.]

REDMAN, APPELLANT, *v.* OHIO DEPARTMENT OF INDUSTRIAL RELATIONS ET AL., APPELLEES.

[Cite as *Redman v. Ohio Dept. of Indus. Relations*, 1996-Ohio-196.]

*Natural resources—Oil and gas—R.C. 1509.08 does not unconstitutionally delegate legislative authority to Chief of Ohio Division of Mines and Reclamation.*

———————

R.C. 1509.08, which grants to the Chief of the Ohio Division of Mines and Reclamation the discretion to ascertain the existence of an "affected mine" and a "well-founded" objection in connection with the disapproval of a permit to dig an oil or gas well in a coal-bearing township, does not unconstitutionally delegate legislative authority.

———————

(No. 94-2284—Submitted January 23, 1996—Decided April 10, 1996.)

APPEAL from the Court of Appeals for Franklin County, Nos. 93APE12-1670 and 93APE12-1671.

———————

{¶ 1} In October 1990, appellant, E.C. Redman, d.b.a. Redman Oil Company, submitted applications to the Ohio Department of Natural Resources, Division of Oil and Gas ("ODOG"), for permits to drill two oil and gas wells, designated Edgar Chambers Well No. 3 in Bristol Township and Harlan Rex Well No. 3 in Manchester Township, both in Morgan County. Pursuant to R.C. 1509.08, upon receipt of an application for a permit to drill a new oil or gas well, the Chief of ODOG is required to determine whether the well is to be located in a coal-bearing township. If it is, the chief must transmit the application to the Chief of appellee

Ohio Department of Industrial Relations, Division of Mines ("ODM").[1] Accordingly, Redman's applications were transmitted to ODM.

{¶ 2} ODM's usual practice upon receipt of such an application is to review the current mining maps on file in order to determine whether there are any coal mines that would be affected by the proposed oil and gas wells. In this case, however, ODM was already familiar with the mining plans of appellee Central Ohio Coal Company ("COCCo") by virtue of an inspection conducted at COCCo's mine office two months earlier by the assistant chief. Accordingly, ODM sent letters to COCCo stating, "Pursuant to [R.C.] 1509.08, *** [a]s owner or lessee of an affected mine, you have the right to object to the proposed drilling ***."

{¶ 3} On October 18, 1990, COCCo sent letters of objection to ODM, accompanied by affidavits of Gary L. Miller, an engineering superintendent and employee of COCCo. The Chief of ODM determined that COCCo's objections were well founded, and disapproved Redman's applications on the basis that the proposed "drilling would interfere with [COCCo's] proposed mining and result in [COCCo's] inability to recover considerable coal reserves."

{¶ 4} Redman appealed the decisions to the Mine Examining Board, and an evidentiary hearing was held. At the hearing, Miller testified that if Redman were permitted to drill the two wells in the proposed locations, it would result in COCCo's losing 160,000 clean tons of coal otherwise recoverable from the Edgar Chambers No. 3 site and 325,000 tons from the Harlan Rex No. 3 site.

---

1. Now the Division of Mines and Reclamation with the Department of Natural Resources. Pursuant to Sections 3 and 10 of 1995 S.B. No. 162, the Department of Industrial Relations was abolished and its functions transferred to several other agencies, which collectively "constitute the continuation of the Department of Industrial Relations." Section 3 of S.B. No. 162, effective October 29, 1995. Further, Section 3 provides that "[n]o validation, cure, right, privilege, remedy, obligation, or liability is lost or impaired by reason of the transfer," and that all of the departments' "rules, orders, and determinations continue in effect as rules, orders, and determinations of [the transferee agencies] until modified or rescinded by those departments." Thus, for purposes of this appeal, we will refer to the various affected agencies and statutes as they existed during and are relevant to the proceedings in this case.

**{¶ 5}** The board affirmed the decisions of ODM disapproving Redman's permit applications. In so doing, the board explained in part as follows:

"The contention of [Redman] is that the Division of Oil and Gas and the Division of Mines have in the past approved the drilling of wells in the same general area, [and] therefore these permits should be approved as in the past. The Central Ohio Coal Company, who owns the mining rights in this area, gave testimony that they had changed their mining plans and the direction of their mine since the letter dated April 9, 1987 was received by [Redman] stating the proposed sites would not interfere with any mine operation for ten (10) or more years. The new Mining plans were necessitated by the new environmental regulations on sulfur emissions recently passed into law; also the need for [COCCo] to stay cost competitive with other fuel suppliers."

**{¶ 6}** Redman appealed the board's decisions to the Franklin County Court of Common Pleas, pursuant to R.C. 119.12.[2] Redman argued in part that R.C.

---

2. The board first issued a decision concerning Redman's applications to drill Edgar Chambers Well No. 3 and Harlan Rex Well No. 3 on February 14, 1991. That decision was appealed by Redman to the Franklin County Court of Common Pleas on March 14, 1991 and designated case No. 91CVF-03-2091. However, discovering that its February 14, 1991 decision had not been served by certified mail on Redman, the board, on April 10, 1991, reissued its decision, which Redman appealed on April 25, 1991. This appeal was designated case No. 91CVF-04-3253 in the Franklin County Court of Common Pleas. The two appeals were consolidated by the trial court and will hereafter be referred to as a single action or case.

On October 6, 1992, after case Nos. 91CVF-03-2091 and 91CVF-04-3253 were already litigated and awaiting decision by the trial court, Redman applied with ODOG for permits to drill two other wells, designated as Harlan Rex Well No. 4 and Edgar Chambers Well No. 4, each near the corresponding No. 3 well. The same procedure was followed administratively with respect to these applications resulting, ultimately, in disallowance. Redman appealed the decision of ODM with respect to Harlan Rex Well No. 4 and Edgar Chambers Well No. 4 to the Franklin County Court of Common Pleas, designated case No. 93CVF-04-2666.

On April 28, 1993, COCCo filed a motion with the trial court to consolidate case No. 93CVF-04-2666 with case Nos. 91CVF-03-2091 and 91CVF-04-3253, which the trial court granted on June 23, 1993. Redman contends that, pursuant to our holding in *Mezerkor v. Mezerkor* (1994), 70 Ohio St.3d 304, 638 N.E.2d 1007, the absence of a Civ.R. 54(B) certification prevented the immediate appealability of case Nos. 91CVF-03-2091 and 91CVF-04-3253, thus requiring a remand to the trial court to decide case No. 93CVF-04-2666. We find *Mezerkor* to be inapplicable to the unique set of facts involved in the case *sub judice*, inasmuch as case Nos. 91CVF-03-2091 and 91CVF-04-3253 had been fully litigated and were poised for judgment in the common pleas court.

1509.08 unlawfully delegates legislative authority to the Chief of ODM. The case was referred to a referee, who recommended that the court find that Redman's permit applications were properly disapproved by ODM, and affirm the board's decisions to uphold the disapprovals. In particular, the referee reasoned as follows:

"The policies behind the statutory scheme -- safety, conflict resolution and the maximum utilization of Ohio's mineral resources -- are clear. While there is no specific list of criteria to determine what constitutes a well-founded objection by an affected mine owner, detailed standards would be problematic; the problems and conflicts associated with locating an oil and gas well near a particular mining operation are site-specific and variable. *** Thus, R.C. 1509.08 gives the Chief of the Division of Mines, a person with expertise in mineral extraction, the flexibility necessary to control the development of natural resources so that oil and gas can be extracted safely without undue disturbance of affected coal mining operations. In addition, the Board reviews the Division's exercise of discretion, and judicial review is available to assure that relevant data have been properly considered. Accordingly, there has been no unconstitutional delegation of authority."

{¶ 7} The trial court adopted the referee's report and recommendations, with one relevant clarification:

"To construe 'affected mine' to mean only mines with active extraction operations taking place, would be to jeopardize the economic and efficient mining of coal. If [oil and gas] wells can be placed on land which has already been analyzed, probed and planned [for coal extraction], but before actual [coal] extraction takes place, then a significant amount of coal could be lost *** [and] all the planning and operation would be wasted. Thus, it is only logical to read the R.C. § 4151.01(A) definition of mine as including the land in question.

---

In such circumstances *Mezerkor* does not apply even though the cases had been consolidated. The consolidation was only to ensure that the same judge would dispose of all of the cases. It is in the best interest of judicial economy for us to proceed to consider the issues raised.

"The Court is aware of [the] concerns that if 'mine' is construed to mean land which will be mined in the future, the coal companies, which own 'thousands and thousands of acres of land in Ohio,' may oppose all requests for permits to drill oil and gas wells on this land, even if no well-defined mining plans have been developed. To that end, the Court clarifies the Report by holding that 'mine,' as the term applies to 'affected mine,' means not only land where active extraction is taking place, but also land which has had extensive, well-defined mining plans developed and where future mining has been thoroughly planned for and evolved to the point of realization."

{¶ 8} The court of appeals affirmed the judgment of the trial court.

{¶ 9} The cause is now before the court pursuant to the allowance of a discretionary appeal.

_____

*Butler, Cincione, DiCuccio & Dritz* and *Alphonse P. Cincione; Ashworth & McKinniss* and *John Ashworth,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Christopher Jones*, Assistant Attorney General, for appellee Ohio Department of Industrial Relations, Division of Mines.

*Simpson, Thacher & Bartlett, Michael P. Graney* and *Susan L. Simms*, for appellee Central Ohio Coal Company.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 10} The primary issue in this case is whether R.C. 1509.08 unlawfully delegates legislative authority to the Chief of ODM.

{¶ 11} Section 36, Article II of the Ohio Constitution provides that laws may be passed "to provide for the regulation of methods of mining, weighing, measuring and marketing coal, oil, gas and all other minerals." Pursuant to this authority, and pursuant to the police power of the state to control and conserve the

natural resources of Ohio, see, *e.g.*, *State v. Martin* (1958), 168 Ohio St. 37, 40-41, 5 O.O.2d 293, 295, 151 N.E.2d 7, 10-11, the General Assembly has enacted a number of statutes regulating the production of coal, oil and gas, including R.C. Chapter 1509.

**{¶ 12}** R.C. 1509.05 provides in part that "[n]o person shall drill a new well *** without having a permit to do so issued by the chief of the division of oil and gas." However, under R.C. 1509.08, when a proposed well is determined by the Chief of ODOG to be located in a coal-bearing township, the decision whether to grant the permit is essentially transferred to the Chief of ODM.

**{¶ 13}** Pursuant to R.C. 1509.08, the Chief of ODOG, upon determining that the proposed well is to be located in a coal-bearing township, must transmit copies of the permit application to the Chief of ODM. The Chief of ODM must then notify the owner or lessee of any "affected mine" that the application has been filed. If the owner or lessee timely objects, and "if in the opinion of the chief [of ODM] the objection is well founded, he shall disapprove the application." The applicant may then "appeal the disapproval of the application by the chief of the division of mines to the mine examining board created under section 4151.14 of the Revised Code."[3]

**{¶ 14}** Redman contends that R.C. 1509.08 is unconstitutional on its face because it "fails to provide any definition of the term 'affected mine' and further fails to provide any guidelines as to what constitutes a 'well founded' objection."[4]

---

3. R.C. 4151.14 has been recodified at R.C. 1561.10. The provisions of R.C. Chapter 4151, like other statutes in Title 41 of the Revised Code relative to the regulation of the production of coal, oil and gas, have been either repealed or amended and renumbered, effective October 29, 1995. See fn. 1 above.

4. Although at first blush it would appear that the primary focus of our inquiry should be on the term "well founded," since this is the ultimate substantive determination to be made by the chief, it cannot be ignored, as Redman persuasively argues, that "if there is no 'affected mine,' no objection can be made and the permit to drill would be issued." Accordingly, our inquiry must focus on the totality of discretion accorded the chief of ODM by R.C. 1509.08.

**{¶ 15}** For over a century, the court has adhered to the principle that the General Assembly cannot delegate its essential legislative power to administrative bodies or officers. *Blue Cross of Northeast Ohio v. Ratchford* (1980), 64 Ohio St.2d 256, 259, 18 O.O.3d 450, 452, 416 N.E.2d 614, 617; *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph one of the syllabus; *Matz v. J.L. Curtis Cartage Co.* (1937), 132 Ohio St. 271, 8 O.O. 41, 7 N.E.2d 220, paragraph six of the syllabus; *Cincinnati, Wilmington & Zanesville RR. Co. v. Commrs. of Clinton Cty.* (1852), 1 Ohio St. 77, 88.

**{¶ 16}** The basic purpose of the nondelegation doctrine is to control unbridled agency discretion. See *Matz, supra*, 132 Ohio St. at 280-281, 8 O.O. at 45, 7 N.E.2d at 225. However, over the years the court has become increasingly concerned that a rigid application of the nondelegation doctrine would unduly hamstring the administration of the laws. We have, therefore, developed a number of distinctions and exceptions in an effort to balance the need for protection from uncontrolled agency discretion and the administrative flexibility necessary to allow the government to operate efficiently and effectively.

**{¶ 17}** Initially, the court distinguished between the delegation of legislative power, *i.e.*, the power to make the law, and the delegation of administrative power, *i.e.*, the power to execute the law. *Cincinnati, Wilmington & Zanesville RR. Co., supra*, 1 Ohio St. at 88.[5]

**{¶ 18}** In *Belden, supra*, 143 Ohio St. at 343, 28 O.O. at 301, 55 N.E.2d at 636, the court explained as follows:

---

5. One writer has astutely depicted this as a classic statement demonstrating that "[t]he early method of escape from the proposition that legislative power may not be delegated was by pretending that 'filling up the details' was not an exercise of legislative power." Davis, Administrative Law Text (3 Ed.1972) 37, Section 2.06. See, also, 1 Davis & Pierce, Administrative Law Treatise (3 Ed.1994) 66-67, Section 2.6.

"It must be conceded that the legislative body cannot deal with each specific case and therefore legislative action in the main must be general in character, which is the basis for the rule that it is no violation of the constitutional inhibition against the delegation of legislative power for the General Assembly to establish a policy and fix the standards for guidance of administrative agencies, while leaving to them the making of subordinate rules within those fixed standards, and the determination of facts to which the legislative policy applies."

{¶ 19} We recognized, however, that there are times when the delineation of specific standards would not be necessary to sustain the legislation under attack. In *Yee Bow v. Cleveland* (1919), 99 Ohio St. 269, 124 N.E. 132, paragraph three of the syllabus, the court held that:

"An ordinance imposing on an administrative officer, as a prerequisite to the issuance of a license, the duties of ascertaining whether sanitary and drainage arrangements are sufficient to protect the public health and whether 'adequate ventilation' and 'adequate plumbing and drainage facilities' are provided on the premises, does not confer arbitrary legislative or judicial powers upon such officer in a constitutional sense. If his conduct should prove to be arbitrary or palpably unwarranted, resort may be had to the courts."

{¶ 20} In so holding, the court explained that:

"It is exceedingly doubtful whether a fixed standard could be adopted by the city in its regulation of those features. What would prove to be sufficient and adequate in one public laundry might be entirely insufficient and inadequate in another. And any attempt to provide by law for the multitudinous details defining what would be sufficient and adequate measures of regulation, applicable to each and every laundry falling within the class mentioned, would seriously tax legislative ingenuity." *Id.*, 99 Ohio St. at 274, 124 N.E. at 133.

{¶ 21} Similarly, in *State ex rel. Moock v. Cincinnati* (1929), 120 Ohio St. 500, 505-506, 166 N.E. 583, 585, the court found that "[i]t is obvious that the city

8

cannot, by ordinance, prescribe all the terms and conditions under which a permit shall be granted for the collection and removal of garbage. The fact that the ordinance did not prescribe the conditions and terms under which a permit should be granted, but left their determination to the city manager, did not confer legislative power upon him in a constitutional sense."

{¶ 22} This reasoning formed the basis for the impracticability exception set forth as follows in *Matz, supra,* at paragraph seven of the syllabus:

"As a general rule a law which confers discretion on an executive officer or board without establishing any standards for guidance is a delegation of legislative power and unconstitutional; but when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations."

{¶ 23} This holding in *Matz* has served as the basis upon which a wide variety of legislative enactments have been upheld as valid delegations of authority. *Blue Cross of Northwest Ohio v. Jump* (1980), 61 Ohio St.2d 246, 252, 15 O.O.3d 257, 261, 400 N.E.2d 892, 896-897; *State v. Schreckengost* (1972), 30 Ohio St.2d 30, 32-33, 59 O.O.2d 60, 62, 282 N.E.2d 50, 52; *State v. Switzer* (1970), 22 Ohio St.2d 47, 50, 51 O.O.2d 69, 71, 257 N.E.2d 908, 910; *Carney v. Bd. of Tax Appeals* (1959), 169 Ohio St. 445, 451-452, 8 O.O.2d 465, 468, 160 N.E.2d 275, 280; *Weber v.Butler Cty. Bd. of Health* (1947), 148 Ohio St. 389, 35 O.O. 351, 74 N.E.2d 331, paragraph two of the syllabus; *Akron & Barberton Belt RR. Co. v. Pub. Util. Comm.* (1947), 148 Ohio St. 282, 287-288, 35 O.O. 288, 290-291, 74 N.E.2d 256, 259; *Thompson v. Marion* (1938), 134 Ohio St. 122, 128-129, 11 O.O. 549, 552, 16 N.E.2d 208, 211.

**{¶ 24}** Thus, in *Ratchford, supra,* 64 Ohio St.2d 256, 18 O.O.3d 450, 416 N.E.2d 614, at the syllabus, we held that:

"A statute does not unconstitutionally delegate legislative power if it establishes, through legislative policy and such standards as are practical, an intelligible principle to which the administrative officer or body must conform and further establishes a procedure whereby exercise of the discretion can be reviewed effectively."

**{¶ 25}** There are two published Ohio cases in which the issue of unlawful delegation has been raised in conjunction with R.C. Chapter 1509. Both cases involved the following italicized language appearing in R.C. 1509.12: "Unless written permission is granted by the chief, any well *which is or becomes incapable of producing oil or gas in commercial quantities* shall be plugged." (Emphasis added.) These cases, reaching antithetical results, are instructive not for their holdings, but for what they fail to do.

**{¶ 26}** The court of appeals in *State v. Wallace* (1976), 52 Ohio App.2d 264, 6 O.O.3d 262, 369 N.E.2d 781, upheld the statutory language, but failed to address the issue of the need for policy guidelines or standards. See, also, *Tiger Corp. v. Call* (1982), 8 Ohio App.3d 158, 160, 8 OBR 217, 219, 456 N.E.2d 554, 557.

**{¶ 27}** The Findlay Municipal Court in its decision in *State v. Wallace* (1974), 40 Ohio Misc. 29, 69 O.O.2d 228, 318 N.E.2d 883, held that R.C. 1509.12 illegally delegates legislative authority to the Chief of the ODOG. The court relied upon *Matz, supra*, to reach the conclusion that "[n]o administrative board or body may be delegated so much discretion without guidelines and no guidelines appear here." *Id.*, 40 Ohio Misc. at 31, 69 O.O.2d at 230, 318 N.E.2d at 885. The court gave no attention, however, to general policy guidelines and the impracticability exception of *Matz*.

**{¶ 28}** That failure has not gone unnoticed. Emens & Lowe, Ohio Oil and Gas Conservation Law—The First Ten Years (1965-1975) (1976), 37 Ohio St.L.J. 31, 72-74, commented as follows:

"*** The ruling of the municipal court as to the constitutionality we think was clearly wrong. ***

"The legislature's delegation of authority to the Chief of the Division of Oil and Gas to determine whether a well is incapable of commercial production is precisely the sort of delegation which the Supreme Court of Ohio had in mind when it laid down the exception to the general rule in *Matz.* The Ohio oil and gas law is a conservation statute, aimed at securing the rational and beneficial development of the oil and gas resources of the state. Wells no longer capable of economical production must be properly plugged in order to protect the environment and the safety of the populace. Whether a specific well has become incapable of producing oil or gas in commercial quantities is a determination that must be made on a well by well basis ***."

**{¶ 29}** Other courts have applied similar impracticability exceptions to legislation dealing with the conservation of natural resources. See *Colorado Interstate Gas Co. v. State corp. Comm.* (1963), 192 Kan. 29, 37, 386 P.2d 288, 293-294; *Wotton v. Bush* (Cal.1953), 41 Cal.2d 460, 469, 261 P.2d 256, 261; 1A Summers, Oil and Gas (1954) 182-185, fns. 34 and 35, Section 106 and 1995 Cumulative Pocket Part, 48. In *State ex rel. Std. Mining & Dev. Corp. v. Auburn* (1973), 82 Wash.2d 321, 330-331, 510 P.2d 647, 653, the Supreme Court of Washington explained:

"[T]he specification of standards is not always appropriate in administrative actions. The function of prescribing the conditions under which a special use permit [issued to conduct a gravel-mining operation] may be enjoyed is one to which this principle is applicable. Only rarely will the environmental factors

affecting different special use applications be the same. Generally speaking, the conditions imposed must necessarily differ from case to case."

{¶ 30} The relevant thrust of R.C. 1509.08 is to transfer from ODOG to ODM the authority to determine the propriety of issuing a permit to dig an oil or gas well when the well is to be located in a coal-bearing township.[6] This reflects a policy choice by the General Assembly that considerations relevant to the conservation, mining, development and production of coal play a part in that determination. Accordingly, the inquiry as to the existence of guiding principles must necessarily transcend the boundaries of R.C. Chapter 1509, which deals only with oil and gas production.

{¶ 31} Former R.C. 4151.03 provided that:

"The division of mines shall enforce and supervise the execution of all laws enacted for the health and safety of persons and the protection and conservation of property within, about, or in connection with mines, mining, and quarries, and for such purpose shall make, publish, and enforce necessary rules and regulations not inconsistent with the mining laws of this state." Am.Sub.H.B. No. 234, 131 Ohio Laws 234. See now R.C. 1561.03. See fn. 1 above.

{¶ 32} R.C. 1551.31 provides:

"The general assembly hereby finds and declares that:

"(A) Coal is one of the state's best, most abundant energy resources;

"(B) In recent years the coal industry in this state has experienced economic difficulties that have resulted in a loss of jobs in that industry;

"(C) Some coal users are reluctant to use coal from this state because of its high sulfur content;

---

6. R.C. 1509.08 provides that upon receiving an application, "the chief of the division of oil and gas shall determine whether the well is or is to be located in a coal bearing township." The term "coal bearing township," however, is defined as "a township designated as such by the chief of the division of mines under section 4151.11 of the Revised Code." R.C. 1509.01(Q).

"(D) The increased use of Ohio coal in this state could enable the state to be more energy self-sufficient;

"(E) It is therefore imperative for this state to have a strong, viable coal industry in order to create and preserve jobs and improve the economy of this state and that, in order to strengthen that industry, methods must be found to use Ohio coal in an environmentally acceptable, cost effective manner.

"Accordingly, it is declared to be the public policy of the state, through operation of sections 1551.30 to 1551.36 of the Revised Code and other applicable laws and authority vested in the general assembly, to assist in the development of facilities and technologies that will lead to increased, environmentally sound use of Ohio coal."

{¶ 33} R.C. 1551.311 provides:

"The general assembly hereby finds and declares that the future of the Ohio coal industry lies in the development of clean coal technology and that the disproportionate economic impact on the state under Title IV of the 'Clean Air Act Amendments of 1990,' 104 Stat. 2584, 42 U.S.C.A. 7651, warrants maximum federal assistance to the state for such development. It is therefore imperative that the department of development, its Ohio coal development office, the Ohio coal industry, the Ohio Washington office in the office of the governor, and the state's congressional delegation make every effort to acquire any federal assistance available for the development of clean coal technology, including assisting entities eligible for grants in their acquisition. The Ohio coal development agenda required by section 1551.34 of the Revised Code shall include, in addition to the other information required by that section, a description of such efforts and a description of the current status of the development of clean coal technology in this state and elsewhere."

{¶ 34} R.C. 1551.32 provides:

"(A) There is hereby established within the department of development the Ohio coal development office whose purposes are to:

"(1) Encourage, promote, and support siting, financing, construction, and operation of commercially available or scaled facilities and technologies, including, without limitation, commercial-scale demonstration facilities and, when necessary or appropriate to demonstrate the commercial acceptability of a specific technology, up to three installations within this state utilizing the specific technology, to more efficiently produce, beneficiate, market, or use Ohio coal;

"(2) Encourage, promote, and support the market acceptance and increased market use of Ohio coal through technology and market development;

"(3) Assist in the financing of coal development facilities;

"(4) Encourage, promote, and support, in state-owned buildings, facilities, and operations, use of Ohio coal and electricity sold by utilities in this state that use Ohio coal for generation;

"(5) Improve environmental quality, particularly through cleaner use of Ohio coal; and

"(6) Assist and cooperate with governmental agencies, universities and colleges, coal producers, coal miners, electric utilities and other coal users, public and private sector coal development interests, and others in achieving these purposes.

"(B) The office shall give priority to improvement or reconstruction of existing facilities and equipment when economically feasible, to construction and operation of commercial-scale facilities, and to technologies, equipment, and other techniques that enable maximum use of Ohio coal in an environmentally acceptable, cost-effective manner."

{¶ 35} These policy statements establish intelligible principles: the safety of persons; the conservation of property; the maximum utilization, development and production of coal and coal technology in an environmentally and economically

proficient manner; and the prevention of physical and economic waste. Similarly, the principles underlying R.C. Chapter 1509 are safety, R.C. 1509.08 and 1509.18; protection of correlative rights, R.C. 1509.01(I) and 1509.40; and the prevention of physical and economic waste, R.C. 1509.20, 1509.24, 1509.27 and 1590.28.

{¶ 36} These principles provide sufficient guidance to the Chief of ODM in resolving conflicts arising from the simultaneous quest to produce oil/gas and coal. Moreover, they far exceed in specificity others which the court has sustained. For example, in *Carney, supra*, 169 Ohio St. at 453, 8 O.O.2d at 469, 160 N.E.2d at 280-281, the court upheld certain delegating tax legislation on the following basis:

"We are not here confronted with a situation in which no policy determination and no standards for guidance have been established by the General Assembly. On the contrary, one standard is established, one positive policy is determined, one precise goal is specified. This standard, this policy and this goal are all contained in one word, uniformity."

{¶ 37} To require the establishment of precise standards to guide the Chief of ODM in the exercise of his duties under R.C. 1509.08 would amount to an insistence on the impracticable. Moreover, it would tend to frustrate the flexibility required to accommodate the multifarious and unforeseen details composing every conflict arising from drilling an oil or gas well in the vicinity of a coal-mining operation in a coal-bearing township. The establishment of detailed standards is no more practicable, necessary or desirable here than in *Yee Bow* and *State ex rel. Moock, supra*; nor is it any less incongruous with the need for flexibility. Thus, we agree with the referee that "detailed standards would be problematic; the problems and conflicts associated with locating an oil or gas well near a particular mining operation are site-specific and variable. *** In addition, the Board reviews the Division's exercise of discretion, and judicial review is available to assure that relevant data have been properly considered."

**{¶ 38}** In addition, the General Assembly has established particular standards under R.C. 1509.221 to govern the issuance of a permit to drill or inject a substance into a well for the exploration or extraction of certain minerals other than oil or natural gas. It is therefore apparent that the General Assembly has made a policy decision that specific standards are impracticable and unnecessary to achieve the legislative purposes sought to be accomplished under R.C. 1509.08.

**{¶ 39}** "Absent a showing of abuse of discretion in such determination, and here none has been demonstrated, the decision of the legislative body in such respect should not be disturbed by a court." *Schreckengost, supra*, 30 Ohio St.2d at 33, 59 O.O.2d at 62, 282 N.E.2d at 53. See, also, *Jump, supra*, 61 Ohio St.2d at 252, 15 O.O.3d at 261, 400 N.E.2d at 896-897.

**{¶ 40}** Accordingly, we hold that R.C. 1509.08, which grants to the Chief of ODM the discretion to ascertain the existence of an "affected mine" and a "well-founded" objection in connection with the disapproval of a permit to dig an oil or gas well in a coal-bearing township, does not unconstitutionally delegate legislative authority.

**{¶ 41}** Redman also argues that "[t]he operative effect of [R.C.] 1509.08 is an unconstitutional delegation of legislative authority when it is applied to the facts of this case." In particular, Redman assails the chief for "ignor[ing] the fact that Mr. Redman already had preexisting wells on those same leases" and for arbitrarily determining that COCCo was the owner of an "affected mine." As to the latter contention, Redman takes issue with the fact that the chief "did not check the active mine map [as was the usual practice, and] afforded COCO the opportunity to object based solely on his belief that at some time in the future COCO planned to mine the area encompassing the proposed well sites."

**{¶ 42}** To the extent that this argument purports to describe a lack of guidance due to the absence of specific standards, it is duplicative of Redman's previous arguments. Moreover, it serves, instead, to illustrate that the problems of

permitting oil and gas wells in coal-bearing townships are, in fact, "site-specific and variable."

**{¶ 43}** To the extent that it purports to challenge the chief's authority to proceed by adjudication rather than rule-making, it is now well settled that "the decision whether to proceed by rule making or adjudication to resolve a dispute lies primarily in the informed discretion of the administrative agency." *Hamilton Cty. Bd. of Retardation & Developmental Disabilities v. Professionals Guild of Ohio* (1989), 46 Ohio St.3d 147, 151, 545 N.E.2d 1260, 1265. "Since the type of proof required can vary from case to case, it was reasonable, and thus lawful, for the [chief] to leave such a decision to the adjudicative process." *Ratchford, supra*, 64 Ohio St.2d at 262, 18 O.O.3d at 454, 416 N.E.2d at 619. See, also, *Dressler Coal Corp. v. Call* (1981), 4 Ohio App.3d 81, 4 OBR 161, 446 N.E.2d 785.

**{¶ 44}** To the extent that Redman challenges the chief's actions as arbitrary and unreasonable, we disagree. As to Redman's contention that the chief ignored the fact that Redman already had other wells in close proximity to Edgar Chambers Well No. 3 and Harlan Rex Well No. 3, the record does not disclose the extent to which the chief considered the presence of Redman's preexisting wells in reaching his decision to deny Redman's applications in the case *sub judice*. Instead, Redman would have us assume that the chief acted arbitrarily. We cannot make such an assumption, given that the board specifically found that COCCo was forced to change its mining plans after the previous wells were approved in 1987, due to new environmental regulations and economic factors. It is entirely reasonable to reach a different conclusion under such different circumstances, especially in light of the testimony that the new proposed wells would result in COCCo's loss of considerable coal reserves.

**{¶ 45}** As to Redman's contention that the chief did not check the active mine map, we find nothing arbitrary in proceeding under R.C. 1509.08 to notify COCCo of the proposed wells based upon ODM's personal knowledge of

COCCo's mining plans. Redman's contention in this regard amounts to a proposition that the chief must ignore his actual knowledge of COCCo's mining plans in the absence of an active mine map on file. We find no authority in R.C. 1509.08 or elsewhere to support this proposition, and Redman fails to offer any.

{¶ 46} Lastly, we cannot find the chief's interpretation of the term "affected mine" as used in R.C. 1509.08 to encompass more than active mining operations to be unreasonable. The issue of whether a mine is an "affected mine" under R.C. 1509.08 only comes to surface when a proposed well is or is to be located in a coal-bearing township. R.C. 1509.01(Q) defines "coal bearing township" as "a township designated as such by the chief of the division of mines under section 4151.11 of the Revised Code." In turn, former R.C. 4151.11 (now R.C. 1561.06) provided in part that:

"The chief shall also designate the townships in which coal is being mined *or in which coal is found in such thickness as to make the mining of such coal probable at some future time* as 'coal bearing townships' as such term is used in Chapter 1509. of the Revised Code." (Emphasis added.)

{¶ 47} Considering R.C. 1509.08 in light of former R.C. 4151.11 and the general legislative policy goals bearing on the production of coal, we cannot find it unreasonable to interpret the term "affected mine" to encompass more than active mining operations.

{¶ 48} In light of the foregoing, the decision of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SLABY, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

DOUGLAS, J., dissents.

LYNN C. SLABY, J., of the Ninth Appellat eDistrict, sitting for WRIGHT, J.

———————————