[Cite as *Murray Energy Corp. v. Div. of Mineral Resources Mgt.*, 2013-Ohio-4162.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| MURRAY ENERGY CORPORATION, ET AL., | ) | |
| | ) | |
| APPELLEES, | ) | |
| | ) | CASE NOS. 11-BE-37 |
| V. | ) | 11-BE-38 |
| | ) | |
| DIVISION OF MINERAL RESOURCES MANAGEMENT, | ) | OPINION |
| | ) | |
| APPELLANT, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| OXFORD OIL COMPANY, | ) | |
| | ) | |
| APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Administrative Appeal from the Reclamation Commission, Case No. RC-11-006

JUDGMENT:     Affirmed

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: September 23, 2013

[Cite as *Murray Energy Corp. v. Div. of Mineral Resources Mgt.*, 2013-Ohio-4162.]
APPEARANCES:

For Plaintiffs-Appellees                    Attorney Mark Stemm
Murray Energy Corporation, et al.           Attorney Michael Wehrkamp
                                            Porter, Wright, Morris & Arthur, LLP
                                            41 S. High St.
                                            Columbus, Ohio 43215


For Defendant-Appellant                     Attorney Molly Corey
Division of Mineral Resources               Attorney Daniel Martin
Management                                  Assistant Attorneys General
                                            Environmental Enforcement Section
                                            Ohio Department of Natural Resources
                                            2045 Morse Road, Building D-2
                                            Columbus, Ohio 43299


For Intervenor-Appellant                    Attorney Timothy McGranor
Oxford Oil Company                          Attorney John Keller
                                            Vorys, Sater, Seymour and Pease, LLP
                                            52 E. Gay St.
                                            P.O. Box 1008
                                            Columbus, Ohio 43216-1008

DONOFRIO, J.

{¶1} This consolidated appeal involves two decisions of the Reclamation Commission concerning a permit to drill an oil and gas well issued by the Chief of appellant Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM), to appellant Oxford Oil Company (Oxford). The site of the proposed well is located on property appellee Murray Energy Corporation (Murray) intends to mine for coal. The chief issued the permit with conditions and Murray appealed that decision to the commission. Oxford filed a motion asking the commission to dismiss Murray's appeal on the procedural grounds that Murray lacked standing and that its appeal was untimely. The commission first denied Oxford's motion to dismiss and then reversed the chief's issuance of the permit. Before this court, Oxford appeals the commission's decision denying its motion to dismiss Murray's appeal of the issuance of the permit to the commission and the DMRM appeals the commission's decision reversing the chief's issuance of the permit.

{¶2} This case concerns property owned by Dale Russell in Goshen Township, Belmont County, Ohio. Consolidated Land Company (CLC) has the coal and mining rights to the property. Russell leased the oil and gas rights to Oxford, a registered oil and gas operator in Ohio.

{¶3} Oxford submitted two oil and gas well permit applications to the chief of the DMRM on February 10, 2011. (Application Nos. aPATT019352 and aPATT019354.) The first application was for a vertical well, while the second application was for Oxford to plug-back the vertical well and drill out horizontally. Despite being drilled vertically and horizontally, the proposed well would penetrate the Pittsburgh No. 8 coal seam at the same location and in the same manner leading the chief to consolidate review of the two applications. Therefore, Oxford would effectively be operating only one well, known as the proposed Russell No. 1 Well (hereinafter referred to in the singular and/or as "the proposed well").

{¶4} Goshen Township, the proposed site of Oxford's oil and gas well, is designated as a "coal bearing township" under R.C. 1561.06. Therefore, R.C. 1509.08 required that the chief notify the owner or lessee of any "affected mine"

about the applications. Records showed that the Ohio Valley Coal Company (OVCC) is actively mining the Pittsburgh No. 8 coal seam at the Powhatan No. 6 Mine approximately four miles east of the proposed Russell No. 1 Well.

{¶5} CLC, mentioned earlier, serves as OVCC's land holding company, maintaining title to the coal and mining rights until shortly before OVCC actually mines an area. CLC and OVCC are subsidiaries of Murray Energy Corporation (Murray). The coal mined by OVCC is transferred to another Murray subsidiary, American Energy Corporation (AEC), for sale to utilities that use it to generate electricity.

{¶6} On February 14, 2011, the chief sent a letter to OVCC notifying it about Oxford's applications for the proposed well. In the letter, the chief also informed OVCC of R.C. 1509.08's requirement that it provide support establishing it has an "affected mine," and, if so, giving it the opportunity to object to the proposed well.

{¶7} On February 21, 2011, OVCC and CLC filed an objection to the proposed well, citing four reasons: (1) they intend to mine the coal at the site of the proposed well; (2) the proposed well would interfere with that mining; (3) they own that coal along with an uninterrupted right of way access to it and through it; and (4) Ohio public policy favors coal development when conflicts arise with oil and gas. They also noted that they could not identify any alternative drilling sites within their coal reserves.

{¶8} The chief determined that OVCC and CLC's objection was unfounded since conditions could be placed on the permit. In his May 13, 2011 letter decision,

the chief acknowledged that OVCC has a permit to longwall mine[1] the Pittsburgh No. 8 coal seam in Goshen Township and is actively mining in an area to the east of the proposed well. However, the chief observed that there is not an active permit to mine coal in the area beneath the site of the proposed well, there is no pending application to mine coal from that property, and OVCC did not indicate when they intended to mine the property. Specifically, the chief found that OVCC and CLC's objection was "not sufficiently well founded because conditions to the permit can reasonably be expected to prevent a substantial risk that the oil and gas operation will result in violation of RC Chapter 1509 that will present an imminent danger to public health or safety or damage to the environment."

{¶9} The chief indicated that a permit to drill the Russell No. 1 Well would be issued to Oxford on the condition that Oxford, if it cannot establish superior property rights in a court of competent jurisdiction, plug and abandon the well in accordance with federal Mine Safety and Health Administration (MSHA) standards before OVCC's mining approached the well. OVCC and CLC, along with Murray and AEC (hereinafter collectively referred to as Murray) requested that the chief informally review his initial decision, pursuant to R.C. 1513.13(A)(3). Murray sought greater detail and clarification of the conditions.

{¶10} The chief held a meeting with representatives from the DMRM, Murray, and Oxford participating. Following that meeting and in a June 14, 2011 letter decision, the chief stood by his initial decision to issue the permit. However, he revised the conditions in an attempt to address Murray's concerns.

{¶11} On June 29, 2011, Murray appealed the chief's May 13, 2011 and June 14, 2011 letter decisions to the Reclamation Commission. Oxford moved to dismiss Murray's appeal on the basis that it was not timely filed within fifteen days of the

---

1. Generally, there are two types of coal mining – longwall mining and room and pillar mining. In longwall mining a whole section of coal is taken from an area. In that underground section after the coal is extracted there are no pillars left to hold up that empty section. The surface area of this land subsides filling in the empty section of earth left from the coal extraction. Room and pillar mining leaves pillars in these areas and does not cause as much settling of the surface area as occurs with longwall mining. Room and pillar mining extracts only about 50% of the coal. *Buckeye Forest Council v. Div. of Mineral Res. Mgmt.*, 7th Dist. No. 01 BA 18, 2002-Ohio-3010, fn. 1.

chief's May 13, 2011 decision. The commission denied the motion on September 21, 2011. Oxford appealed that decision to this court in case number 12-BE-37.

**{¶12}** The commission heard Murray's appeal of the chief's May 13, 2011 and June 14, 2011 letter decisions with all parties presenting witnesses and evidence. On October 6, 2011, the commission vacated the chief's approval of the applications to drill the proposed well. The commission concluded that the chief lacked the statutory decision authority to impose the permit conditions, likening the chief's actions to an adjudication of a property rights dispute for which it was not a tribunal of competent jurisdiction. The commission found that it would not reach the issue of whether Murray owned an affected mine since the chief had exceeded his authority. The commission remanded the matter to the chief to take actions consistent with its decision. The DMRM appealed that decision to this court in case number 12-BE-38. This court consolidated Oxford's appeal (12-BE-37) and the DMRM's appeal (12-BE-38) in the interest of judicial economy. 11/29/2011 J.E.

## STANDARD OF REVIEW

**{¶13}** The standard of review of a reclamation commission's decision is defined by statute. R.C. 1513.14(A) directs that the court of appeals "affirm the decision of the commission unless the court determines that it is arbitrary, capricious, or otherwise inconsistent with law, in which case the court shall vacate the decision and remand to the commission for such further proceedings as it may direct." As such, this court's standard of review from the decision of the Reclamation Commission is "limited". *Pleasant City v. ODNR, Div. of Reclamation*, 67 Ohio St.3d 312, 316 (1993); *Buckeye Forest Council v. Division of Min. Res. Mgmt.,* 7th Dist. No. 01 BA18, 2002-Ohio-3010, ¶ 7.

**{¶14}** In such cases, a reviewing court begins with the presumption that the Commission's action was valid. *C. & T. Evangelinos v. Division of Min. Res. Mgmt.,* 7th Dist. No. 03BE70, 2004-Ohio-7061, ¶ 18; *Buckeye Forest,* 7th Dist. No. 01 BA18 at ¶ 7, 16. We recognize that the legislature has delegated certain authority to the Commission and that the Commission has accumulated substantial expertise. *Buckeye Forest,* 7th Dist. No. 01 BA18 at ¶ 29, 31, 43, citing R.C. 1513.02. *See also*

*Tri-State Reclamation, LLC v. Division of Mines and Min. Res. Mgmt.,* 5th Dist. No. 04CA19, 2005-Ohio-6439 (deferring to agency interpretation of statutes). Thus, deference must be given to the expertise of the Commission in determining whether the mining application should be approved. *See Pleasant City,* 67 Ohio St.3d at 320.

## STATUTORY FRAMEWORK

**{¶15}** Section 36, Article II of the Ohio Constitution provides that laws may be passed "to provide for the regulation of methods of mining, weighing, measuring and marketing coal, oil, gas and all other minerals." Pursuant to this authority, and pursuant to the police power of the state to control and conserve the natural resources of Ohio, *see e.g. State v. Martin,* 168 Ohio St. 37, 40-41, 151 N.E.2d 7 (1958), the General Assembly has enacted a number of statutes regulating the production of coal and oil and gas, including R.C. Chapter 1509, which deals only with oil and gas production.

**{¶16}** R.C. 1509.05 provides in part that "[n]o person shall drill a new well * * * without having a permit to do so issued by the chief of the division of mineral resources management * * *." R.C. 1509.08 addresses proposed wells in coal bearing townships.

## OXFORD'S APPEAL 12-BE-37

### *Affected Mine*

**{¶17}** Since Oxford's two assignments of error concern standing and jurisdiction, its appeal will be addressed first. Oxford's first assignment of error states:

> The Reclamation Commission erred in vacating the May 13, 2011 decision of the Chief of the Division of Mineral Resources Management because Appellees do not own or lease an affected mine and therefore lack standing to object to the permit.

**{¶18}** When the DMRM receives an application from an oil and gas operator to drill a well in a "coal bearing township," R.C. 1509.08 requires the chief to immediately notify the owner or lessee of any "affected mine" about the application

and include with that notification a map showing the location of the proposed well. R.C. 1509.08 then allows the owner or lessee of the "affected mine" the opportunity to object to the proposed siting of the well. If the owner or lessee of an "affected mine" objects, the chief must then determine if the objection is sufficiently well founded or not, and either disapprove or approve the permit accordingly.

{¶19} In this case, while acknowledging that Murray owns thousands of acres of coal reserves in Belmont County, Oxford contends that it does not own an "affected mine," and, therefore, never had standing to object to its applications. Since neither the Ohio Revised Code nor the Ohio Administrative Code defines "affected mine," Oxford cites the Ohio Supreme Court's decision in *Redman v. Ohio Dept. of Indus. Relations*, 75 Ohio St.3d 399, 662 N.E.2d 352 (1996), in support.

{¶20} In 1990, the Redman Oil Company (Redman) applied for two oil and gas well permits to be located in a coal bearing township. The Ohio Division of Mines (ODM) determined from the applications and the attached maps that the proposed wells could affect mines owned by the Central Ohio Coal Company (COCCo) and notified it about the applications. COCCo objected, maintaining that the proposed wells would interfere with its existing plan for mining coal reserves. COCCo attached an affidavit of its engineering superintendent in support along with maps offering alternative well locations that would not interfere with its mining plans. ODM's chief determined COCCo's objections to be well founded and disapproved the applications. Redman appealed to the Mine Examining Board and, following an evidentiary hearing, it affirmed the chief's decision to disapprove the applications.

{¶21} Redman then appealed to the Franklin County Common Pleas Court where the matter was referred to a referee who issued a report that recommended upholding the board's decision to disapprove the applications. The common pleas court adopted the referee's report as its own, Redman appealed, and the Tenth District Court of Appeals affirmed. *Redman v. Ohio Dept. of Indus. Relations*, 10th Dist. Nos. 93APE12-1670, 93APE12-1671, 1994 WL 485750 (Sept. 6, 1994). The Ohio Supreme Court also affirmed on the narrower issue of whether the chief's "affected mine" and "well-founded" determinations under R.C. 1509.08 amounted to

an unconstitutional delegation of legislative authority. *Redman v. Ohio Dept. of Indus. Relations*, 75 Ohio St.3d 399, 662 N.E.2d 352 (1996).

{¶22} Redman had argued that because there was no presently active excavation at the sites and there were no plans to begin excavation until at least 1994, the mines could not be considered "affected mines." *Redman*, 10th Dist. Nos. 93APE12-1670, 93APE12-1671, 1994 WL 485750 at *9. In its decision, the Ohio Supreme Court quoted and left undisturbed the common pleas court's discussion of "affected mine":

> "To construe 'affected mine' to mean only mines with active extraction operations taking place, would be to jeopardize the economic and efficient mining of coal. If [oil and gas] wells can be placed on land which has already been analyzed, probed and planned [for coal extraction], but before actual [coal] extraction takes place, then a significant amount of coal could be lost * * * [and] all the planning and operation would be wasted. Thus, it is only logical to read the R.C. § 4151.01(A) definition of mine as including the land in question.

> "The Court is aware of [the] concerns that if 'mine' is construed to mean land which will be mined in the future, the coal companies, which own 'thousands and thousands of acres of land in Ohio,' may oppose all requests for permits to drill oil and gas wells on this land, even if no well-defined mining plans have been developed. To that end, the Court clarifies the Report by holding that 'mine,' as the term applies to 'affected mine,' means not only land where active extraction is taking place, but also land which has had extensive, well-defined mining plans developed and where future mining has been thoroughly planned for and evolved to the point of realization."

*Redman*, 75 Ohio St.3d at 402, 662 N.E.2d 352.

{¶23} In his May 13, 2011 and June 14, 2011 letter decisions, the chief did not specifically address whether Murray owned an "affected mine" in the area of the

proposed well. However, since the chief notified Murray of Oxford's applications pursuant to R.C. 1509.08, the chief necessarily determined by implication that Murray owned an "affected mine." In reviewing the chief's decisions, the Reclamation Commission quoted approvingly from *Redman* and stated that Murray's mine "would seem to qualify" as an "affected mine" and offered reasons in support. However, despite acknowledging that identification of an "affected mine" in the area of the proposed well is a "threshold determination" under R.C. 1509.08, it stopped short of making a finding in that regard based on its later conclusion that the conditions the chief placed on the permit exceeded his statutory authority.

{¶24} Oxford argues that Murray has no immediate plans under the site of the proposed well as evidenced by the lack of a permit or an application for a permit to mine there. Oxford cites testimony that Murray will not have active mine works near the proposed well until 2022. Oxford also argues that Murray does not own all of the coal in the vicinity of the proposed well, preventing it from being able to mine that area as planned.

{¶25} Murray advances numerous arguments in response. Murray argues that the "affected mine" term is relevant only in the narrow context of the chief's obligation under R.C. 1509.08 to immediately notify owners and lessees of mines that may be affected by a proposed oil and gas well. Murray contends that the "affected mine" term imposes no statutory requirement upon a mine owner who objects to a permit application after receiving notification to prove that they have an "affected mine." In other words, Murray argues that, in practical terms, "[o]nce a mine owner has learned of a drilling application from the Chief's notification, the Chief's decision turns on the merits of the objections – not a determination in hindsight of whether the Chief should have immediately notified the mine owner in the first place." (Murray's Brief, p. 22.)

{¶26} The "affected mine" term first appears in R.C. 1509.08 where it states, "If the application to drill * * * concerns a well that is or is to be located in a coal bearing township, the chief immediately shall notify the owner or lessee of any *affected mine* that the application has been filed and send to the owner or lessee two

copies of the map accompanying the application setting forth the location of the well." (Emphasis added.) A review of this provision reveals that the "affected mine" determination is indeed a threshold one with no burden upon the owner or lessee of an affected mine to prove that it is the owner of an affected mine. The General Assembly likely left this determination to the chief who by virtue of his regulatory duties has the institutional knowledge as to whether a proposed oil and gas well could potentially affect a nearby coal mining operation. That is not to say that such a determination should necessarily escape administrative or judicial review. Although not directly addressing the issue, the *Redman* decision certainly suggests otherwise. Nonetheless, as a practical matter, when the chief's more relevant and substantive inquiry shifts to whether the mine owner's objections are sufficiently well founded, if it turns out that the mine owner who received notification does not own an "affected mine," they necessarily will be unable to put forth objections that the chief could find sufficiently well founded.

{¶27} In this case, there was evidence to support the chief's initial and implicit determination that Murray owns an affected mine. There is active mining four miles east of the proposed well that is moving in the direction of the site for the proposed well. Murray has conducted field analyses to seek an extension of its permit into the area of the proposed well and developed a mine projection map. Testimony indicated that mining could reach the area of the proposed well as early as 2014. Thus, although Murray is not currently mining the site of the proposed well nor yet has a permit to do so, it has undertaken significant pre-permit application preparations and made a substantial capital investment in furtherance of its plans to establish its intent to mine that area in the future and qualify itself as the owner of an "affected mine."

{¶28} Accordingly, Oxford's first assignment of error is without merit.

*Timeliness of Appeal*

{¶29} Oxford's second assignment of error states:

The Reclamation Commission erred in vacating the May 13, 2011 decision of the Chief of the Division of Mineral Resources Management because the Murray Companies did not timely appeal the decision within the mandatory 15-day period set by R.C. 1509.08.

**{¶30}** Typically, in cases not involving a coal bearing township, an affected party has thirty days to appeal the chief's decision to the reclamation commission:

Any person having an interest that is or may be adversely affected by a * * * decision of the chief of the division of mineral resources management * * * or by any modification, vacation, or termination of such * * * decision, may appeal by filing a notice of appeal with the reclamation commission for review of the * * * decision within thirty days after the * * * decision is served upon the person or within thirty days after its modification, vacation, or termination and by filing a copy of the notice of appeal with the chief within three days after filing the notice of appeal with the commission.

R.C. 1513.13.

**{¶31}** As indicated earlier, R.C. 1509.08 addresses how the chief is to proceed if he receives an application for an oil and gas well to be sited in a coal bearing township. In particular, R.C. 1509.08 creates an expedited review procedure for cases involving a coal bearing township:

The owner or lessee may appeal the decision of the chief to the reclamation commission under section 1513.13 of the Revised Code. *The appeal shall be filed within fifteen days, notwithstanding provisions in divisions (A)(1) of section 1513.13 of the Revised Code, to the contrary, from the date on which the owner or lessee receives the notice.* If the appeal is not filed within that time, the chief immediately shall approve the application and issue the permit if the provisions of

this chapter pertaining to the issuance of such a permit have been complied with.

(Emphasis added.)

{¶32} However, in this case, the Reclamation Commission found that Murray's act of seeking an informal review of the chief's May 13, 2011 decision tolled the time for appeal. R.C. 1513.13(A)(3) specifically contemplates tolling if an affected party seeks an informal review of the chief's decision:

> Any person authorized under this section to appeal to the commission may request an informal review by the chief or the chief's designee by filing a written request with the chief within thirty days after a notice, order, decision, modification, vacation, or termination is served upon the person. Filing of the written request shall toll the time for appeal before the commission, but shall not operate as a stay of any order, notice of violation, or decision of the chief. The chief's determination of an informal review is appealable to the commission under this section.

{¶33} Oxford argues that, by its express terms, R.C. 1513.13(A)(3)'s tolling provision applies only to the 30-day period set by R.C. 1513.13(A)(3). Further, Oxford notes that R.C. 1509.08 expressly states that the 30-day period set by R.C. 1513.13(A)(3) does not apply to R.C. 1509.08 expedited appeals: "The appeal shall be filed within fifteen days, *notwithstanding provisions in divisions (A)(1) of section 1513.13 of the Revised Code, to the contrary*, from the date on which the owner or lessee receives the notice." (Emphasis added.) Therefore, Oxford concludes, because this case involved a coal bearing township appeal, Murray's appeal of the chief's May 13, 2011 letter decision was governed by R.C. 1509.08's 15-day period and R.C. 1513.13(A)(3)'s tolling provision did not apply.

{¶34} Murray argues that its appeal was timely since the chief's June 14, 2011 decision modified and superseded the chief's May 13, 2011 decision and

Murray appealed the chief's June 14, 2011 decision on June 29, 2011 – within the 15-day period set by R.C. 1509.08. In the alternative, Murray argues that R.C. 1513.13(A)(3)'s tolling provision applies to all decisions of the chief, including those under R.C. 1509.08.

{¶35} As the Reclamation Commission correctly observed, R.C. 1509.08 is silent as to whether R.C. 1513.13(A)(3)'s informal review procedures apply to appeals initiated under R.C. 1509.08. Since R.C. 1509.08 does not specifically preclude R.C. 1513.13(A)(3)'s informal review procedures, it is a reasonable argument that its tolling provision could apply.

{¶36} However, Murray's alternative argument under this assignment of error offers a more judicially efficient means of resolving this issue and obviates the need for statutory interpretation of R.C. 1509.08 and R.C. 1513.13(A)(3). It is undisputed that Murray did not timely appeal the chief's May 13, 2011 decision and, instead, sought informal review. However, when the chief issued his June 14, 2011 decision modifying the conditions, he effectively rendered his May 13, 2011 decision interlocutory or non-final, and nonappealable. It is unquestioned that the chief's June 14, 2011 decision was his final decision on Oxford's application and Murray timely appealed that decision.

{¶37} Accordingly, Oxford's second assignment of error is without merit.

### DMRM'S APPEAL 11-BE-38

*Scope of Chief's Authority to Impose Permit Conditions*

{¶38} Turning now to the DMRM's appeal of the Reclamation Commission's October 6, 2011 decision reversing the chief's issuance of the permit with conditions, the DMRM raises four assignments of error. The DMRM's first and second assignments of error each address the chief's authority to impose conditions on the issuance of an oil and gas well permit and whether those conditions would be effectual or enforceable. Therefore, they will be addressed together. They state, respectively:

The Commission Erroneously Concluded that R.C. 1509.06 Does Not Authorize the Chief to Condition a Drilling Permit Upon the Plugging of a Producing, Active Oil and Gas Well. (Order at 26-27).

The Commission Acted in a Manner Inconsistent with Law in Determining that Condition 2(A), Which Allowed Oxford Oil to Prove Superior Property Rights in Lieu of Plugging, Was an Improper Adjudication of Property Rights. (Order at 20-22).

**{¶39}** In his June 14, 2011 letter decision, the chief issued the permit on the condition that within six months of Murray mining the area, Oxford either establish superior property rights in a court of competent jurisdiction or plug and abandon the well in accordance with OAC 1501:9-11-08(A)(6) and MSHA requirements before OVCC's mining approached the well. The chief imposed the permit conditions in reliance upon R.C. 1509.06. R.C. 1509.06 sets forth the procedures for applying for an oil and gas well permit. In his June 14, 2011 letter decision, the chief stated, "Conditions to the permit can reasonably be expected to prevent a substantial risk that the oil and gas operation will result in violations of RC Chapter 1509 that will present an imminent danger to public health or safety or damage to the environment." From this statement, it appears the chief relied on subdivision (F) of R.C. 1509.06 in imposing the "produce superior property rights or plug" condition.

**{¶41}** R.C. 1509.06(F) addresses one particular situation in which conditions may be placed on an oil and gas permit:

> The chief shall issue an order denying a permit if the chief finds that there is a substantial risk that the operation will result in violations of this chapter or rules adopted under it that will present an imminent danger to public health or safety or damage to the environment, provided that where the chief finds that terms or conditions to the permit can reasonably be expected to prevent such violations, the chief shall issue the permit subject to those terms or conditions * * *.

**{¶42}** Thus, under R.C. 1509.06(F), the chief can issue a permit subject to conditions if: (1) he finds that there is a substantial risk that the operation will result in violations of R.C. Chapter 1509 (Oil and Gas) or the rules adopted thereunder; (2) those violations will present an imminent danger to public health or safety or damage to the environment; and (3) those conditions can reasonably be expected to prevent such violations.

**{¶43}** In his June 14, 2011 letter decision, the chief stated, "Conditions to the permit can reasonably be expected to prevent a substantial risk that the oil and gas operation will result in violations of RC Chapter 1509 that will present an imminent danger to public health or safety or damage to the environment." Beyond this unclear statement, the chief made no specific finding that there was a substantial risk that Oxford's proposed well would result in violations of Ohio's statutory oil and gas law.

**{¶44}** Rather, it appears that the chief created the conditions only in an attempt to assuage Murray's concerns with the well as expressed in its objections. Mike McCormac, oil and gas permitting manager for DMRM, explained the true intent behind the conditions:

> The primary intent of these conditions is to put Oxford Oil on notification that if we issue the permit and if they drill the well, that there are requirements that they are going to have to comply with when they plug the well. There actually will be another set of more detailed conditions that would occur when the plugging permit was issued. So this is basically -- as we're trying to balance the interests between -- as our statute requires, and as our mission statement requires, between the coal mining in Ohio and the oil and gas activity in Ohio, and as 1509.08 kind of charges us to this.
>
> So in this particular case, we put these conditions together to allow oil and gas wells to be drilled, yet at the same time taking into consideration the coal mining industry as well.

(Reclamation Hearing Tr. 493-494.)

{¶45} In addition to the lack of any concern over possible violations of Ohio's statutory oil and gas law, there has also been no suggestion from any of the parties involved herein that the proposed well would present an imminent danger to public health or safety or damage to the environment. In sum, neither of the first two threshold findings for imposition of permit conditions under R.C. 1509.06(F) existed in this case, regardless of the content of those conditions. Therefore, the Review Commission's decision vacating the chief's approval of the conditional permit on the ground that the chief lacked an adequate statutory basis under R.C. 1509.06(F) to impose such conditions was not arbitrary, capricious, or otherwise inconsistent with law.

{¶46} Accordingly, the DMRM's first and second assignments of error are without merit.

### Well Founded Objections

{¶47} The DMRM's third assignment of error states:

> There is No Evidence in the Record Supporting the Commission's Holding that the Chief Found Objections to the Well to be "Well Founded" by Implication. (Order at 16-19).

{¶48} In both his May 13, 2011 and June 14, 2011 letter decisions, the chief found Murray's objections were not sufficiently well founded given that conditions could be imposed to address its concerns. In reviewing those decisions, the Reclamation Commission viewed that as finding Murray's objections to be well founded, *but for* the imposition of the permit conditions. The commission viewed the chief's role under R.C. 1509.08 as being limited to either finding the objections well founded or not well founded. The commission viewed the conditions as "complicating" the R.C. 1509.08 objection process.

{¶49} In this regard, the DMRM argues that the commission unlawfully substituted its judgment for the chief's. The DMRM cites to the chief's discretion under R.C. 1509.08 to determine whether an owner or lessee's objections are sufficiently well founded. In response, Murray agrees with the commission's view of

the chief's determination on its objections. Murray argues that the record shows that but for the permit conditions, its objections were sufficiently well founded.

**{¶50}** As explained under the DMRM's first and second assignments of error, it appears that the chief created the conditions only in an attempt to assuage Murray's concerns with the well as expressed in its objections. Consequently, the Reclamation Commission viewing that as the chief finding Murray's objections to be well founded, *but for* the imposition of the permit conditions was not arbitrary, capricious, or otherwise inconsistent with the law.

**{¶51}** Accordingly, the DMRM's third assignment of error is without merit.

*Expert Witness*

**{¶52}** The DMRM's fourth assignment of error states:

> The Commission's Refusal to Qualify Division Witness Craig Corder as an "Expert in Mine Safety" Was an Abuse of Discretion Resulting in Prejudice to the Division in Presenting Its Case. (Tr. at 1151:7 to 151.8).

**{¶53}** On the fifth day of the hearing before the Reclamation Commission, the DMRM called its Mine Safety Program Manager, Craig Corder, to testify as an expert witness. The commission, without explanation, declined to qualify Corder as an expert in mine safety. Nonetheless, the commission did allow the DMRM to proffer Corder's opinion that it would be safe for Murray to mine through a plugged well. (Tr. 1239:16 – 1240:21.)

**{¶54}** The DMRM argues that the commission's decision to not qualify Corder as an expert in mine safety was arbitrary and capricious given Corder's experience and the commission's qualifying four of Murray's witnesses as expert witnesses, each with experience similar to that of Corder. In response, Murray argues that the DMRM was not prejudiced by the commission's decision in this regard since it was able to proffer Corder's opinion and that opinion had no bearing on the chief's authority to impose the permit conditions.

**{¶55}** In this instance, the Reclamation Commission did not abuse its discretion in declining to qualify Corder as an expert in mine safety. Corder was allowed to testify at length about his experience in mine safety and mining through plugged wells. In other words, the DMRM was still able to put all of Corder's testimony before the commission for consideration. Given the nature of the proceedings (i.e., that the commission is essentially judge and jury), the commission's decision not to qualify him as an expert was inconsequential. The commission's decision was not otherwise arbitrary or capricious in that it qualified Murray's witnesses as experts since Corder admittedly did not have experience in longwall mining.

**{¶56}** Accordingly, the DMRM's fourth assignment of error is without merit.

**{¶57}** The decision of the Reclamation Commission is affirmed.

Vukovich, J., concurs.

Waite, J., concurs.