Chief Judge Fuld.
This appeal, posing a question of first impression and here by our leave, requires us to construe provisions of the Conservation Law empowering the Conservation Department to regulate the development and operation of natural gas fields in this State.
The Sylvania Corporation, the petitioner herein, and Wyckoff Development Company, the respondent, are gas and oil producers operating wells in what is known as the Wyckoff Field located in Steuben County.[1] Prior to the summer of 1966, Syl *430 vania had acquired drilling rights in 27 different tracts of property located in the Field by entering into leases with the owners of the individual tracts. Under the terms of these agreements, Sylvania, as lessee, was granted rights to all gas and oil discovered on the various properties and, in return, agreed to share the total royalties earned from the sale of the gas or oil produced from its wells. In July, 1966, Sylvania entered into an agreement with Bichard Harding, Wyckoff’s predecessor in interest, whereby it “ farmed out,” or assigned, to Harding its drilling interests in 8 of the previously acquired 27 tracts, on the express condition that both parties “ agree to maintain a 2,500' distance between wells drilled hereunder, or on adjoining acreage controlled by the parties hereto, unless otherwise mutually agreed upon.”[2] Harding subsequently assigned to Wyckoff his drilling rights, as well as certain other interests which he had acquired in the Field. Sylvania and Wyckoff then proceeded to drill two wells each in the areas covered by the 1966 agreement.
In August, 1967, the Conservation Department ordered a hearing, pursuant to section 77 of the Conservation Law, to determine “well spacing” in the Wyckoff Field—that is, to fix the distance at which the wells should be separated from each other—in order to avoid wasteful exhaustion of resources.[3] *431 Following such a hearing, the department issued an order which directed “ well spacing ” and “ integration."[4] This order (No. 67-3) was subsequently rescinded in July of 1968 by Order No. 67-3A which deleted the provision for integration.[5] It divided the Field into 14 units of approximately 160 acres each and limited drilling to one well in each unit.
The four gas wells drilled by Sylvania and Wyckoff were located in units 5, 9, 11 and 14, respectively, with Sylvania maintaining two wells in units 5 and 11 and Wyckoff maintaining two in the other units. Sylvania and Wyckoff had the only working interests in those four units.
In October, 1968, Wyckoff, asserting that it had sought, unsuccessfully, to reach a voluntary agreement with Sylvania concerning their respective drilling rights in each unit, applied for an integration order, pursuant to section 79. Noting that the Conservation Department had already determined—in Order No. 67-3A—that only one well was permitted in each unit, Wyckoff maintained that, absent integration, owners of working interests in a particular unit would be deprived of their proportionate share of the underground gas. Sylvania, voicing a contrary view, urged that, since a well had already been drilled in areas subsequently defined as units 5, 9 and 11, the 1966 contractual limitation of 2,500 feet constituted ‘6 voluntary integration ” which barred further drilling in these units and, consequently, rendered compulsory integration unnecessary. Some months later, the department issued Order No. 68-4, the subject of this appeal. Finding that “without integration * * * there will be a loss of correlative rights ” and that *432 the agreement could not be construed as a 11 voluntary integration arrangement within the meaning of Sections 78 and 79 ”, it entered an order integrating units 5, 9 and 11 “on the basis of the working interest holdings therein. ’’[6] Sylvania thereupon commenced this article 78 proceeding to review the order, and the Appellate Division unanimously confirmed it.
Our State Legislature has established a comprehensive scheme designed ‘ ‘ to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be had, and that the correlative rights of all owners and the rights of all persons including landowners and the general public may be fully protected” (Conservation Law, § 70). It is unlawful, the statute recites, to “ [w]aste oil or gas ” (§ 73), and the spacing and integration of newly discovered gas fields are required when “necessary to promote * * * development, use or conservation of natural resources of oil or gas” (§§ 77, 79). The Conservation Department has been empowered to ‘ ‘ [r] egulate the drilling of wells and all other operations for the production of gas or oil ” and may “ [m]ake and enforce rules, regulations and orders to effectuate the purposes and intent ” of the statute (Conservation Law, § 75, subd. 1, pars, [i], [j]).
. There can be no doubt as to the constitutionality of this legislation. A number of oil producing states have enacted statutes similar to New York’s[7] and in two of them their high courts have .rejected challenges to the validity of such statutes. (See Hunter Co. v. McHugh, 202 La. 97, app. dsmd. 320 U. S. 222; Kimbrough v. Atlantic Refining Co., 152 So. 2d 412, 415 [La.]; Landowners Oil, Gas & Roy. Own. v. Corporation Comm., 420 P. 2d 542, 544-545 [Okla.]; Anderson v. Corporation Comm., 327 P. 2d 699, 702-703 [Okla.]; see, also, Champlin Rfg. Co. v. Commission, 286 U. S. 210, 232-234.) In Hunter Co. v. McHugh *433 (320 U. S. 222, supra), for instance, the United States Supreme Court, in sustaining the constitutionality of the Louisiana statute, explicitly held that “ a state has constitutional power to regulate production of oil and gas so as to prevent waste and to secure equitable apportionment among landholders of the migratory gas and oil underlying their land, fairly distributing among them the costs of production and of the apportionment ” (p. 227). And, in the Landowners case (420 P. 2d 542, 544, supra), the Oklahoma Supreme Court declared that “ regulation by the state under its police powers of the drilling of oil and gas wells into a common source of supply and the distribution of the production among owners of mineral rights in land overlying the common source of supply does not violate provisions of either State or Federal Constitutions prohibiting taking of property without just compensation or without due process of law.” Manifestly, this regulatory legislation is designed “to prevent waste, and, in so doing, protect the correlative rights of the owners of mineral interests in the land overlying such common supply [of gas and oil].” (Wood Oil Co. v. Corporation Comm., 268 P. 2d 878, 884 [Okla.].)
Sylvania, acknowledging the constitutionality of article 3-A of the Conservation Law, recognizes that the Conservation Department may, in the reasonable exercise of its police power, issue an order regulating gas production. It contends, however, that compulsory integration, pursuant to section 79, is not warranted, on the ground that the July, 1966 agreement—which established a 2,500-foot distance between wells—had already brought about voluntary integration. More precisely, Sylvania states, since the agreement itself promotes the efficient development, use and conservation of the gas in the Wyckoff Field and, by reason thereof, effectuates the statute’s purpose, the department, in altering the provisions of the contract, violated Federal and State constitutional provisions dealing with impairment of contracts and the taldng of private property without just compensation (U. S. Const., art. I, § 10; 5th and 14th Amdts.; N. Y. Const., art. I, §§ 6, 7).
This argument rests on the erroneous premise that both parties to the 1966 contract had agreed upon a plan for the voluntary integration of the Field. The simple fact is, as the *434 Conservation Department concluded on the basis of ample evidence, that the Field had not been voluntarily integrated by the agreement and that, consequently, compulsory integration was necessary if the statutory goal—promotion of the efficient and effective development of the natural gas accumulations underlying units 5, 9 and 11—was to be achieved. Such a determination was eminently proper. Section 78 clearly provides that voluntary integration can only occur after well spacing has been accomplished. ‘ ‘ When two or more separately owned tracts are embraced witlwn a spacing unit, or when there are separately owned interests in all or a part of a spacing unit,” the statute recites, “ the interested persons may integrate their tracts or interests for the development and operation of the spacing unit.” (Emphasis supplied.) As already noted, the agreement between Sylvania and Harding had been executed more than 16 months before any well spacing had been established by the Conservation Department in the Wyckoff Field. Since, therefore, voluntary integration was not, and could not have been, brought about by the 1966 contract, if there was to be any integration it had to be effected by order of the department.
The order appealed from should be affirmed, without costs.
Judges Burke, Scileppi, Bergan, Breitel, Jasen and Gibson concur.
Order affirmed.

. It is so named because Wyckoff made the initial discovery of gas in that area in June, 1967.

. In a “farm out” agreement, “the owner of a lease not desirous of drilling at the time agrees to assign the lease, or some portion of it (in common or in severalty) to another operator who is desirous of drilling the tract. The assignor in such a deal may or may not retain an overriding royalty or production payment.” (7 Williams and Meyers, Oil and Gas Law [1964], p. 146.)

. Section 77, insofar as pertinent, reads as follows:
“ Well spacing in oil pools or fields and in natural gas pools or fields 6 K * shall be subject to the provisions of this section » » » Whenever the department finds after notice and hearing that the spacing of wells in any field is necessary to promote effective development, use or conservation of natural resources of oil or gas”.
As one commentator has observed, “maximum recovery of hydrocarbons from any given [gas] pool can be had only where the wells are placed at proper intervals. When unregulated, producers often allow the profit motive to interfere with their duty to conserve. The [state conservation] department may regulate the spacing of new wells if it finds such spacing is necessary to the most efficient development of a field.” (Mowbray, Regulation of Oil and Gas Producers, 32 Albany L. Rev. 387, 399.)

. Integration, whether “ voluntary ” under section 78 of the Conservation Law, or “ compulsory ” under section 79, serves to protect the correlative rights of parties with interests in a well spacing unit, by requiring that they share proportionately the costs and profits of drilling. Its purpose is to preclude one party, who controls only a portion of a spacing unit, not only from incurring a disproportionate burden of expense but also from gaining a disproportionate benefit where his well drains a part of the unit not under his control.

. The new order substituted the following clause for the one deleted:
“If all of the working interests in any spacing unit fail to agree upon a plan for the development and operation thereof * “ " such unit shall not be developed * * *' pending final determination of a proceeding under Section 79 of the Conservation Law and any judicial review thereof.”

. The order further provided that, in the absence of a voluntary agreement to the contrary, Sylvania was to serve as operator of the wells in units 5 and 11 and Wyckoff as operator of the well in unit 9. Unit 14 was not included in the order since Wyckoff owned 100% of the working interest therein.

. See, e.g., Arizona Rev. Stat. Ann., § 27-531 et seq.) California Pub. Resources Code Ann., § 3315 et seq.) Louisiana Rev. Stat., § 30:5; 52 Oklahoma Stat. Ann., § 287.1 et seq.) see, also, 6 Williams and Meyers, Oil and Gas Law (1968), § 912, p. 97.