NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0058n.06

Case No. 18-3636

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 04, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| COREY KERNS, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| CHESAPEAKE EXPLORATION, L.L.C. | ) | OHIO |
| and RICHARD J. SIMMERS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____/

**Before: MERRITT, GUY, and MOORE, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** The plaintiffs are landowners who collectively own 127 acres of contiguous land in Ohio that is rich in below-ground oil and natural gas. The defendants are a drilling company (Chesapeake Exploration, L.L.C.) and the state official (Richard Simmers) who oversees the Ohio agency that regulates drilling. Chesapeake received permission from the state to drill below the landowners' tracts, and then the landowners sued in federal district court based on federal-question jurisdiction. Their sole cause of action is 42 U.S.C. § 1983. They allege that the drilling constitutes a "taking" under the Fourteenth Amendment. The district court granted the defendants' motions to dismiss and this appeal followed. We affirm.

**I. BACKGROUND**

Allowing unfettered drilling of the same reservoir has consequences. In the case of oil, for instance, with each new drill site the reservoir loses more pressure, thus leaving much of the oil unobtainable. Conflicting hydraulic fracturing operations can likewise result in unnecessary drilling with less overall output. But under the common-law rule of capture, a landowner always has an incentive to quickly drill his own well, regardless of the waste, because if he fails to capture the resources, his neighbor will drill his own well and licitly take it all for himself. To address this problem, Ohio requires "pooling" or "unitization" prior to drilling. This means that if separate-yet-adjoining tracts of land have a common natural resource below them, the tracts are combined into a single "unit" and drilling operations must be coordinated and spaced within the unit. Tract owners then share in the benefits commensurate with their acreage. Owners can agree to voluntarily pool their properties, but in the absence of agreement, the State of Ohio can also compel pooling. Ohio law provides a detailed process for pooling.

A. Ohio's Pooling Process

By law, Ohio has recognized that the "regulation of oil and gas activities is a matter of general statewide interest that requires uniform statewide regulation[.]" Ohio Rev. Code § 1509.02. In particular, the state has expressed its preference for avoiding the waste of oil and gas by requiring owners and lessees who drill for oil or gas to "use every reasonable precaution in accordance with the most approved methods of operation to stop and prevent waste of oil or gas, or both." *Id.* § 1509.20. To further these interests, Ohio established the Division of Oil and Gas Resources Management ("the Division"), which "has sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations within the state," excepting activities regulated by federal law. *Id.* § 1509.02.

Among other restrictions, Ohio law limits how closely wells may be spaced, which can be detrimental to owners of smaller tracts. *See id.* §§ 1509.24–25. For that reason, "owners of adjoining tracts may agree to pool the tracts to form a drilling unit that conforms to the minimum acreage and distance requirements[.]" *Id.* § 1509.26. Tract owners who wish to drill but are unable to get all their neighbors to agree have other recourse: if they collectively own 65% of the land overlying the underground reservoir, they may apply to the Division "for a mandatory pooling order." *Id.* §§ 1509.27, 1509.28(A). In such a case, the chief of the Division must:

> notify all mineral rights owners of tracts within the area proposed to be pooled by an order and included within the drilling unit of the filing of the application and of their right to a hearing. After the hearing or after the expiration of thirty days from the date notice of application was mailed to such owners, the chief, if satisfied that the application is proper in form and that mandatory pooling is necessary to protect correlative rights and to provide effective development, use, and conservation of oil and gas, shall issue a drilling permit and a mandatory pooling order complying with the requirements for drilling a well as provided in section 1509.24 or 1509.25 of the Revised Code, whichever is applicable.

*Id.* § 1509.27. The resultant pooling order describes the boundaries of the unit and the location of the drilling site and also allocates "on a surface acreage basis a pro rata portion of the production to each tract pooled by the order." *Id.* A party adversely affected by the chief's decision may appeal to the Oil and Gas Commission and then to the court of common pleas. *Id.* §§ 1509.36–37.

## B. The Land in Harrison County

Chesapeake wanted to drill in Harrison County using hydraulic fracturing. It set its sights on a 592-acre plot now known as the Our Land Co South Unit ("the Unit"). By 2014, Chesapeake effectively owned most of the land comprising the Unit, but it was unable to reach an agreement with American Energy-Utica, L.L.C., the lessee of 120 acres split across eight tracts. The owners of those tracts had leased their mineral rights to American Energy-Utica in 1981, but the leases were not comprehensive enough to allow the lessee to voluntarily enter a pooling agreement

without the consent of the owners. And the owners were not interested in entering into the pooling agreement proposed by Chesapeake. So, Chesapeake took the involuntary route. In November 2014, it filed an application for a mandatory pooling order, accurately attesting that it was the owner of more than 65% of the land overlying the pool to be drilled.

The landowners opposed the application. During the application process, they submitted filings and attended at least one hearing. They also filed suit in federal district court.[1] Nevertheless, the chief of the Division issued a mandatory pooling order on July 13, 2015. Under the terms of the order, American Energy-Utica was deemed a "non-participating working interest owner."

The landowners appealed to the Oil & Gas Commission and argued, as they do here, that the pooling order amounted to an unconstitutional taking of their property. The Commission pointed out that it lacked jurisdiction to decide constitutional questions and therefore dismissed the appeal. Under Ohio law, the landowners could have further appealed to the court of common pleas of Franklin County, but they chose not to. *See* Ohio Rev. Code § 1509.37. Instead, they sought a writ of mandamus from the Ohio Supreme Court, which denied the writ in January 2018. *State ex rel. Kerns v. Simmers*, 101 N.E.3d 430 (Ohio 2018).

The landowners refiled their federal suit—the instant suit—soon after. In lieu of an answer, Chesapeake and Simmers separately moved to dismiss the complaint. The district court granted the motions, thus leading to this appeal.

---

[1] The district court ultimately dismissed the suit for lack of standing. The court found that the clam was not yet ripe for review because the state administrative proceedings were ongoing. The instant suit, which is functionally the same, was refiled later.

## II. DISCUSSION

### A. Jurisdiction

Both defendants moved to dismiss the case for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Simmers argued that he was immune from suit under the Eleventh Amendment, and Chesapeake raised two separate arguments: (1) the landowners lacked standing because they had already leased their oil and mineral rights to another party; and (2) the landowners' claim was not ripe because they failed to first seek just compensation from Chesapeake in state court. The district court rejected all these arguments. On appeal, Chesapeake revives both of its arguments, while Simmers briefly raises only the argument concerning the leased rights. In any case, "we must independently satisfy ourselves" that we have jurisdiction. *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 388 (6th Cir. 2008).

The defendants' jurisdictional arguments amount to factual attacks, so the landowners bore the burden to prove that the district court had jurisdiction. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986). In reviewing the 12(b)(1) motions, the district court was permitted to consider documents outside the pleadings, including the mineral leases. *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). We review the district court's jurisdictional determination *de novo*. *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). In doing so, however, we must recognize the district court's "considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction" and its obligation to conduct its review "in a manner that is fair to the non-moving party." *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 327 (quoting *Rogers*, 798 F.2d at 918). And we must accept the district court's findings of fact unless they are clearly erroneous. *Id.* at 326.

At Chesapeake's behest, the district court reviewed the mineral leases and reasoned that "[r]egardless of whether or not Plaintiffs own the mineral rights," their allegations of injury extended "beyond the oil and gas itself" because they also alleged that defendants deprived them of the exclusive possession of their land and damaged the subsurface. *Kerns v. Chesapeake Expl., LLC*, No. 5:18-cv-389, 2018 WL 2952662, at *3 (N.D. Ohio June 13, 2018). The district court noted that defendants had "done nothing to challenge Plaintiffs' standing on this basis" and therefore found that plaintiffs had standing. *Id.*

We agree with the district court that the allegations in the complaint are broad enough to assert an injury for standing purposes. First, Ohio courts have recognized that an oil and gas lease can convey a fee simple determinable, thus leaving the lessor with a possibility of reverter. *See, e.g.*, *Chesapeake Expl., L.L.C. v. Buell*, 45 N.E.3d 185, 195–97 (2015). This is a property interest that is conceivably impinged even after the drilling and hydraulic fracturing is complete. *See Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 10 (Tex. 2008) (recognizing that a landowner who leased his mineral rights had standing to sue the drilling company for trespass based upon his possibility of reverter). Second, the landowners allege that Chesapeake's drilling will "permanently alter the subsurface" and even after Chesapeake's operations are complete, "millions of gallons of water, sand and chemicals" will remain beneath the land. Whether these outcomes have exceeded or will likely exceed the permission granted in the leases is a question of fact. For all of these reasons, we will not disturb the district court's finding that, despite the landowners' leases, the landowners pleaded an injury that satisfies standing.

On the matter of ripeness, we also agree with the district court. Chesapeake contended that the landowners could have included it as a party in seeking a writ of mandamus. According to Chesapeake, the landowners' failure to do so means they failed to seek compensation through state

procedures, as required by *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). As the district court found, and as we further explain below, Chesapeake is a private party taking private action. Thus, mandamus could not lie against Chesapeake. *See State ex rel. Longacre v. Penton Publ'g Co.*, 673 N.E.2d 1297, 1298 (Ohio 1997). The claim against Chesapeake is ripe.

The claim against Simmers is also ripe. To initiate a taking, Ohio law requires the government to bring appropriation proceedings against a property owner pursuant to Ohio Rev. Code §§ 163.01–163.62. *See Coles v. Granville*, 448 F.3d 853, 861 (6th Cir. 2006). The landowners filed a mandamus action against Simmers in the Ohio Supreme Court to compel the government to enter such proceedings. *See Kerns*, 101 N.E.3d 430. We have held that this procedure is an appropriate avenue "for plaintiffs to pursue compensation for an involuntary taking . . . no matter whether that taking is a regulatory or a physical one[.]" *Coles*, 448 F.3d at 865. Therefore, although § 1509.37 sets out the proper procedure for reviewing Simmers's order, the mandamus action is the relevant state procedure for obtaining compensation. *See Williamson Cty.*, 473 U.S. at 194 n.13 (explaining that "[e]xhaustion of review procedures is not required[,]" but that "a property owner [must] utilize procedures for obtaining compensation before bringing a § 1983 action."). The landowners utilized that procedure, and the Ohio Supreme Court denied the writ. *See Kerns*, 101 N.E.3d at 435.

## B. State Action

The district court dismissed the claim against Chesapeake because it found that Chesapeake is not a state actor, thus rendering § 1983 inapplicable. The landowners appeal that determination.

Section 1983 creates a private cause of action for deprivations of constitutional rights. A claim is actionable only if the defendant acted "under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory or the District of Columbia[.]" 42 U.S.C. § 1983. A private party qualifies as a state actor if two conditions are met: "(1) the deprivation complained of was caused by the exercise of some right or privilege created by the State and (2) the offending party acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Tahfs v. Proctor*, 316 F.3d 584, 590–91 (6th Cir. 2003) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)) (quotation marks omitted). "Generally, a private party's mere use of the State's dispute resolution machinery, without the overt, significant assistance of state officials, cannot be considered state action." *Id.* (quotation marks and citations omitted, alterations adopted).

This circuit has recognized several tests to determine whether a defendant is a state actor. *See Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014) (recognizing three tests: the public-function test, the state-compulsion test, and the nexus test); *see also Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014) (recognizing the additional "entwinement test."). At the district court, the landowners did little to explain why Chesapeake should be considered a state actor, much less which test to apply. Now on appeal, they principally liken Chesapeake's actions to those of the defendant in *Lugar*. Although the landowners' appellate brief makes a fleeting reference to the public-function and nexus tests, it does nothing to explain their applicability to this case. We therefore consider those arguments forfeited and focus our attention on the *Lugar* case. *Accord S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 564–65 (6th Cir. 2007) (determining that the plaintiff forfeited an argument that the public-function test applies).

*Lugar* involved the state of Virginia's prejudgment attachment proceedings. The plaintiff was a truckstop operator who fell behind on his payments to his supplier. State law allowed the supplier to sequester the plaintiff's property through an *ex parte* petition, prior to a hearing. Upon

the supplier's petition, the clerk of court issued a writ of attachment and the county sheriff executed it. The plaintiff sued the supplier, but not the state, under § 1983, alleging the state law was "procedurally defective under the Fourteenth Amendment." 457 U.S. at 941. The Court agreed that the supplier was a state actor because it jointly participated with state officials in the prejudgment seizure. *Id.*

*Lugar* is inapplicable here. To begin, we have "expressly declined . . . to extend the relatively low bar of *Lugar*'s so-called 'joint action' test outside the context of challenged prejudgment attachment or garnishment proceedings." *Revis v. Meldrum*, 489 F.3d 273, 289 (6th Cir. 2007). Moreover, the alleged harms of inhabiting the landowners' land and taking their oil and gas were and are committed solely by Chesapeake; the state plays no role in carrying those actions out. Chesapeake's "mere use" of the state's pooling order process "without the 'overt, significant assistance of state officials'" does not transform it into a state actor. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (quoting *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 486 (1988)). The district court properly dismissed the § 1983 claim against Chesapeake.

We therefore turn our attention to the remaining defendant, Richard Simmers, whom all parties agree is a state actor.

## C. The Takings Claim

The Fifth Amendment states that private property shall not be "taken for public use, without just compensation." U.S. Const. amend. V. This limitation on takings applies to the states via the Fourteenth Amendment. *Chicago, B. & Q.R. Co. v. City of Chicago,* 166 U.S. 226, 241 (1897). The landowners contend that Ohio's law governing pooling orders allows takings that are not for public use and are done without just compensation. They aver that the pooling order and

procedures concerning their properties were deficient in both respects. We begin, however, with a preliminary question: was this a taking to begin with?

A taking requires a property interest, and for that we look to state law. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010) ("Generally speaking, state law defines property interests[.]"); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984) (noting that property interests stem from sources independent from the Constitution, such as state law). Under Ohio law, "minerals underlying the surface, including oil and gas, are part of the realty," though a landowner may sever the mineral estate through a conveyance. *Chesapeake Expl., L.L.C. v. Buell*, 45 N.E.3d 185, 189–90 (Ohio 2015). But Ohio also recognizes "correlative rights," which it defines as "the reasonable opportunity to every person entitled thereto to recover and receive the oil and gas in and under the person's tract or tracts, or the equivalent thereof, without having to drill unnecessary wells or incur other unnecessary expense." Ohio Rev. Code § 1509.01(I). Thus, under Ohio law each landowner has both a property interest in the subsurface minerals of his lot and an attendant right to recover those minerals without needless waste—as does his neighbor.

By 1950, the Supreme Court had consistently held "that a state may adopt reasonable regulations to prevent economic and physical waste of natural gas." *Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 185 (1950) (further stating that the due process claim against the state regulation was "virtually without substance."). By that time, the Court had "upheld numerous kinds of state legislation designed to curb waste of natural resources and to protect the correlative rights of owners through ratable taking, or to protect the economy of the state." *Id.* (internal citations omitted); *see also Hunter Co. v. McHugh*, 320 U.S. 222, 227–28 (1943) ("We have held that a state has constitutional power to regulate production of oil and gas

- 10 -

so as to prevent waste and to secure equitable apportionment among landholders of the migratory gas and oil underlying their land, fairly distributing among them the costs of production and of the apportionment.") (collecting cases); *cf. Ohio Oil Co. v. Indiana*, 177 U.S. 190, 212 (1900) ("[W]e cannot say that the statute [regulating natural deposits of oil and gas] amounts to a taking of private property, when it is but a regulation by the State of Indiana of a subject which especially comes within its lawful authority."). Ohio's scheme falls comfortably within these bounds. In fact, the landowners here cannot point to a single case that holds a unitization or pooling scheme unconstitutional.

Every state court to address this issue has held that pooling schemes like Ohio's do not effect a taking of a landowner's minerals. The Supreme Court of Oklahoma, for instance, held:

> [T]he lawful exercise of the state's power to protect the correlative rights of owners in a common source of supply of oil and gas is not a proper subject for the invocation of the provisions of either the State or Federal Constitution which prohibit the taking of property without just compensation or without due process of law and forbid the impairment of contract obligations. As we view it, the property here involved has not been taken or confiscated: its use has merely been restricted and qualified.

*Patterson v. Stanolind Oil & Gas Co.*, 77 P.2d 83, 89 (Okla. 1938). Other states have reached similar conclusions. *See, e.g.*, *Gawenis v. Ark. Oil & Gas Comm'n*, 464 S.W.3d 453, 457–58 (Ark. 2015) (holding that the state's procedure did not "take" anything away from the landowner, but rather, allowed him "to lease his interest in the drilling unit in exchange for compensation or to participate in the drilling of the well and receive monetary benefits"); *Sylvania Corp. v. Kilborne*, 271 N.E.2d 524, 527 (N.Y. 1971) (similarly basing its holding on the police power).

We see no reason the same does not hold true in Ohio. The state's supreme court has held that the state's pooling procedures constitute a proper exercise of its police power, just as courts in other states have held. *See Redman v. Ohio Dep't of Indus. Relations*, 662 N.E.2d 352, 361

(Ohio 1996); *Burtner-Morgan-Stephens Co. v. Wilson*, 586 N.E.2d 1062, 1064–65 (Ohio 1992). That power is exercised in the service of protecting property rights by requiring a just, orderly, and efficient process for neighbors to extract common resources. Each landowner's property interest in the minerals remains intact; it is simply regulated. *See Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 185–86 (1950). The landowners therefore have no takings claim as to the minerals below the surface of their land.

Their claim of a taking through *occupation* of the subsurface land is another matter. Apart from their alleged loss of valuable natural resources, the landowners claim that the subsurface horizontal wells that jut through their property lines deprive them of the exclusive use and possession of their land. Simmers's pooling order authorized the horizontal drilling, so the landowners contend that the order (and the statute empowering it) work a taking against them. Again, we must begin by looking to the property allegedly taken.

Ohio qualifies a landowner's subsurface property rights, as illustrated in *Chance v. BP Chemicals, Inc.*, 670 N.E.2d 985 (Ohio 1996). There, the plaintiffs brought a trespass action against a company for disposing of waste in wells miles below the surface. The plaintiffs alleged that the waste had seeped out of the wells and migrated across boundary lines into their own subsurface property. Although the plaintiffs were not making use of any subsurface property, they nevertheless claimed that they were injured by the mere presence of the waste. The Ohio Supreme Court rejected the idea that landowners have "absolute ownership of everything below the surface of their properties," and held instead that their "subsurface rights in their properties include the right to exclude invasions of the subsurface property that actually interfere with [their] reasonable and foreseeable use of the subsurface." 670 N.E.2d at 992.

Under *Chance*, then, a takings claim could conceivably lie based upon subsurface occupation.[2] But alleging a party's mere presence below the ground is not enough to make out a takings claim. Ohio's actual-interference requirement means that the landowners' property interests in the space beneath their land springs to life only if Chesapeake's drilling "actually interfere[s]" with their "reasonable and foreseeable use of the subsurface." *Id.* at 992. In other words, there must be "some type of physical damages or interference with use." *See id.* at 993.

The complaint fails to adequately plead such damage and thus fails to plead the requisite property interest. Although Rule 12(b)(6) does not demand "detailed factual allegations," it does require that a complaint contain more than "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On the matter of subsurface occupation, the complaint gives only a recitation of the elements, generically pleading that the drilling will "impose a continuing permanent invasion of Plaintiffs' property, interfere with Plaintiffs['] reasonable and foreseeable use of said property and constitute a per se taking of said property." Without more, the complaint fails to plead a subsurface property interest and thus fails to state a subsurface takings claim.

The complaint likewise fails to state a claim based on an above-ground taking. As the district court pointed out, the complaint lacks allegations of "any current surface damage" and contains only the allegation "that Chesapeake will enter *beneath* the land, inject water, sand, and chemicals *beneath* the land, and remove oil, gas, and natural gas liquids from *beneath* the land . . . ." *Kerns*, 2018 WL 2952662, at *12. Admittedly, the landowners became more specific on

---

[2] We recognize the *Chance* court's caveat that reasoning from drilling cases was not directly analogous to the matter before it in light of the "special body of law" governing drilling. *Chance*, 670 N.E.2d at 991. Nevertheless, we see no reason the underlying property principle articulated in *Chance* should not guide us here.

appeal, alleging in their reply brief that Chesapeake's method of drilling (hydraulic fracturing) is "potentially hazardous" and can result in "the release of chemicals to the surface, ground water, and water wells, and also the flowback of contaminated liquids from the well, and the treatment of wastewater." And they bolster their allegations as to these new harms with citations to the websites of the U.S. Environmental Protection Agency and the Ohio Department of Natural Resources. But we are reviewing the district court's dismissal of the complaint itself, unaided by the new reply brief's added harms. Even so, an action that is "potentially hazardous" does not make it imminent. Similarly, the webpages merely mention the potential risks that may attend hydraulic fracturing; they do not suggest that hydraulic fracturing necessarily renders surface land unusable—much less that a harm is actual or imminent on the landowners' particular plots.

## D. The Due Process Claim

Due-process claims, like takings claims, require a property interest. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). As we have explained, the complaint failed to adequately plead a property interest. The due process claim therefore fails for the same reason the takings claim fails.

## III. CONCLUSION

The complaint fails to state a claim upon which relief may be granted. Accordingly, the judgment of the district court is AFFIRMED.